FRANKLIN ROBINSON, APPELLEE, V. A. D. JONES, APPELLANT.

[FILED DECEMBER 22, 1890.]

1. Public Lands: CANNOT BE PRE-EMPTED IN TRUST FOR ANOTHER. A party cannot enter public lands under the pre-emption laws in trust for the use and benefit of another, and the court will not decree that an entry was so made, or that the title acquired thereunder by the pre-emption from the government inured to the benefit of any other person.

2. Trusts: EVIDENCE REQUIRED. In order to establish by parol proof that lands are held in trust, the essential facts relied upon must be clearly and satisfactorily proven by a preponderance of the testimony.

APPEAL from the district court for Douglas county. Heard below before WAKELEY, J.

C. A. Baldwin, and J. M. Woolworth cited, to the contention that government land could not be pre-empted in trust for another: St. Peter v. Bunker, 5 Minn., 153; Randall v. Edart, 7 Id., 359; Hosmer v. Wallace, 97 U.S., 575; Bohall v. Dilla, 114 Id., 47; Harkness v. Underhill, 1 Black [U. S.], 316; Myers v. Croft, 13 Wall. [U. S.], 291;

*Smiley v. Sampson,* 1 Neb., 56; *Warren v. Van Brunt,* 19
Wall. [U. S.], 646; *Leggett v. Dubois,* 5 Paige [N. Y.],
114; *R. Co. v. Durant,* 95 U. S., 576; Perry, Trusts, sec.
131; 2 Story, Eq. Jur., sec. 1201 *b.*

*A. J. Poppleton,* and *John W. Lytle, contra,* cited, con-
tending that Jones pre-empted the land in trust for Rob-
inson: Perry, Trusts, secs. 127, 128, 130, 217, 367; *Rus-
sell v. Jackson,* 10 Hare [Eng.], 209; *McLarren v. Brewer,*
51 Me., 402; *Seaman v. Cook,* 14 Ill., 505; *Farmers, etc.,
Bank v. King,* 57 Pa. St., 202; *Persch v. Quiggle,* Id., 247;
*Brush v. Ware,* 15 Pet. [U. S.], 104; *Smith v. Wright,*
49 Ill., 403; *Lyford v. Thurston,* 16 N. H., 399; *Worm-
ley v. Wormley,* 8 Wheat. [U. S.], 421; *Oliver v. Piatt,* 3
How. [U. S.], 333; *Caldwell v. Carrington,* 9 Pet. [Id.], 86;
*Wright v. Dame,* 22 Pick. [Mass.], 55; *Murray v. Ballou,*
1 Johns. Ch. [N. Y.], 566; *Ryan v. Doyle,* 31 Ia., 53;
*Smith v. Walser,* 49 Mo., 250; *Sayre v. Townsend,* 15
Wend. [N. Y.], 651; Story, Eq. Jur. [13th Ed.], secs.
1257–61; *Olcott v. Bynum,* 17 Wall. [U. S.] 59; *Natl.
Bank v. Ins. Co.,* 104 U. S., 54; *Silver v. Ladd,* 7 Id., 228;
*Garland v. Wynn,* 20 How. [U. S.], 6; *Lytle v. State of
Ark.,* 22 Id., 193; *Linsdey v. Hawes,* 2 Black [U. S.],
559; *Stark v. Starrs,* 6 Wall. [U. S.], 402; *Johnson v. Tows-
ley,* 13 Id., 85.

NORVAL, J.

The plaintiff, Franklin Robinson, when eighteen years
old, enlisted as a soldier in the Mexican war, serving as a
private in Captain Stewart's company, battalion Missouri
mounted volunteers.    He was discharged at the close of
the war and returned to his home ·in Gentry county,
Missouri.    In May, 1849, the plaintiff left for Califor-
nia, where he remained and resided until shortly before
instituting this suit in the court below.    Before leaving
Missouri, Robinson made application for a land warrant,

to which he was entitled for services as a soldier. It not having been issued when he started for California, he arranged with 'Squire Tolliver, of Gentry county, Missouri, to receive it when issued. On the 26th day of May, 1849, land warrant No. 58,547 was issued to Robinson, authorizing its location upon any 160 acres of government land subject to private entry. This warrant was received by Tolliver, by him turned over to Mrs. Elizabeth Reeves, and by her to the defendant Alfred D. Jones. The facts and circumstances surrounding the receipt of the warrant by Mrs. Reeves and Jones will be referred to hereafter.

On the 13th day of June, 1853, the defendant Alfred D. Jones made actual settlement upon the west half of the southeast quarter and the east half of the southwest quarter of section thirty-five, in township seventy-five north, of range forty-four west, in Pottawattamie county, Iowa, for the purpose of taking the same as a pre-emption.

On the 29th day of June, 1853, Jones, at the United States land office at Kanesville, Iowa, pre-empted the land and located the above described warrant thereon. On January 3, 1854, a patent was issued to Jones for the 160 acres of land. March 27, 1854, Jones sold and conveyed one-half of said tract to Samuel S. Fleming for $1,000, and the other half on the 23d day of April, 1868, to Sidney Dillon for $24,000. Of the proceeds arising from the sale of the land the sum of $3,000 was used and applied by Jones in the purchase of lot 6, in block 140, in the city of Omaha, which lot was subsequently sold by Jones for $3,000, and the money was applied on the payment of the purchase price of lot 8, in said block 140. The sum of $5,000 of the consideration received for the sale of the 160 acres was used by Jones to purchase lot 5, in block 165. The sum of $9,807 of the proceeds received by Jones from the sale of the quarter section was used by him in making improvements on said lot, and the sum of $7,193, being the remainder of the consideration received by Jones for the

land, was, at the time of the trial, in Jones's possession. Jones received as rents and profits from the Omaha lots and buildings thereon the sum of $10,889.04, after deducting the total amount of expenditures made by him, and $5,000 additional for services in the care and management of the premises.

Upon the pleadings and the proofs the district court found subtantially that a trust resulted to Robinson in the above described quarter section of land by reason of locating the land warrant thereon; that Jones held the Omaha property, purchased with the proceeds of the sale of land, in trust for the use and benefit of the plaintiff; that Jones was liable to Robinson for the income received by him from the city lots and for the remainder of the proceeds arising from the sale of the land which had not been invested by Jones. A judgment was rendered in favor of the plaintiff and against the defendant Alfred D. Jones for the sum of $10,889.04, that being the net income received by Jones from the city lots, and for the sum of $7,193, being the invested proceeds derived from the sale of the land, with interest on said sums from the commencement of the suit until date of judgment, making, in the aggregate, the sum of $20,769.07. A conveyance was ordered made to the plaintiff for lot 5, in block 165, and lot 8, in block 140, was ordered sold to pay the sum of $3,000 declared to be a lien thereon in favor of the plaintiff. From this judgment Jones appeals.

The testimony relating to the manner in which the land warrant came into the possession of Jones is very conflicting. The substance of the testimony of the plaintiff Franklin Robinson, bearing upon this subject, is that when he went into the army his parents lived in Gentry county Missouri, and after his discharge in November, 1848, he returned to his home, where he spent the winter. That in August, 1848, while he was in the army, his mother died, and early the winter following Mrs. Elizabeth Reeves, who

then resided in Iowa, an aunt of the plaintiff, went to Missouri after two minor children left by his mother, a half brother and sister to Robinson. She did not return home until spring, but spent the winter in Missouri. In April, 1849, Robinson helped his aunt take the children and some household goods, sheep, cattle, and horses to her home in Iowa, a few miles from the place where the town of Winterset now stands. While on this trip Robinson visits with Jones, who then resided near Mrs. Reeves. The plaintiff shortly after returning home from the army made application for a land warrant, and not having received it from Washington at the time he was visiting with the defendant Jones in Iowa, he claims to have made arrangement with Jones in regard to the disposition that should be made of it when issued. We quote from the plaintiff's testimony.

Q. State in full all the arrangements you made with him.

A. I made Mr. Jones agree when the warrant came to my place—that is the man that I would leave it with in Missouri—he was to get it and lay it for me, that is, in my name.

Q. Who was it you had made the arrangement with to receive the warrant if it came?

A. Came to Missouri?

Q. Yes.

A. Tolliver, a justice of the peace.

Q. Where did he live?

A. He lived a neighbor to us in Missouri, right adjoining to my step-father.

Q. In what place?

A. In Gentry county, Missouri.

Q. What is the name of the postoffice or town?

A. Athens was the postoffice then.

Q. It was to be sent to your address at the postoffice there?

A. Yes, sir.

Q. Did you make any arrangement with any one, and if so, whom, to receive the warrant when it should come to the postoffice?

A. I made arrangements with Tolliver—that is "old 'Squire Tolliver," that we called him—if the warrant came to my postoffice he was to get it and bring it home and to take care of it; if he got a chance, to forward it to Iowa to Mr. Jones, or let him know he had it; told him the arrangement I had made after I went back; he was to get the warrant and take care of it. * * * There was plenty of government land and I was calculating, when he got the warrant, he was to lay the warrant for me.

Q. In whose name?

A. In my name. I never saw the warrant.

Q. You never have seen the warrant?.

A. Never have seen the warrant until to-day.

Q. Now, I will ask you to look at that warrant and see whether or not you ever saw the warrant until it was produced in court here this morning.

A. I saw the warrant this morning; yes, sir; in the hands of the officer; I never saw it before to-day.

Q. Just refer to the back part of the warrant and see whether you ever made any assignment of that warrant as appears upon the back here, or whether you ever authorized an assignment to be made.

A. No sir; neither one. I never saw the warrant until to-day in my life; I never authorized any assignment, in any way, shape, manner, or form.

Q. Did you ever appear before Mr. Jones and acknowledge an assignment of this warrant?

A. No, sir, I didn't.

The plaintiff also testified that he never authorized the delivery of the warrant to Mrs. Reeves, nor was she to keep it for him; that he did not inform Jones that the warrant was to be received by Mrs. Reeves and was to be

assigned to her; that he never made any arrangements with Mrs. Reeves by which the warrant was to be received by her, for her benefit, and that he did not execute a power of attorney to Jones authorizing him to assign the warrant.

The testimony of Alfred D. Jones, one of the defendants, is to the effect that the plaintiff, before he went to California, informed him that he had been a soldier in the Mexican war, and had applied for and expected to receive a land warrant; that Robinson stated that he had made arrangements for Mrs. Reeves to have it when issued, to aid in the support of his half brother and sister, and that she could dispose of it as she liked; that Robinson at that time gave a written power of attorney authorizing Jones to assign the warrant so Mrs. Reeves could use it, which was acknowledged by Robinson before a justice of the peace.

Jones further testified that he kept the power of attorney until after he moved to Omaha, since which time it has disappeared and cannot be found; that he never had any conversation with Robinson to the effect that he was to locate the warrant for the plaintiff; that at Mrs. Reeves's request, in June, 1852, he made the assignment on the back of the warrant, leaving a blank for the name of the assignee, as was the custom; that he signed Robinson's name and made his mark thereto, and certified that it was acknowledged by Robinson before himself as notary public, and immediately returned the warrant to Mrs. Reeves. That in June, 1853, Jones made settlement and started improvements upon the land in Pottawattamie county, Iowa, for the purpose of pre-empting it; that Mrs. Reeves gave him the land warrant in question for the purpose of paying out on the land, and that the United States land officers filled the blank in the assignment with Jones's name as assignee.

The testimony of Mrs. Jones fully corroborates that given by her husband.

Elizabeth Reeves testified that she was eighty-nine years old, is the mother of Mrs. Jones, and the aunt of Robinson; that in the spring of 1849, while she was in Gentry county, Missouri, Robinson arranged with Tolliver in her presence that he was to give the warrant to her when received to keep until he returned from California; that after the warrant was issued she went to Missouri for and obtained it from Tolliver; that it remained in her possession until Jones took his pre-emption, when she gave it to him, and that she never knew or heard of an assignment of the warrant or of the existence of a power of attorney.

If it be true, as testified to by the plaintiff and alleged by him in the petition upon which the case was tried, that Jones agreed with the plaintiff to receive the warrant and locate it in Robinson's name, and afterwards, in violation of that agreement, laid the warrant in his own name, will a court of equity enforce a trust in favor of the plaintiff? The testimony conclusively shows that the land on which the warrant was located was not subject to private entry, and could only be taken as a pre-emption. It is therefore necessary to examine the provisions of the pre-emption act in order to determine whether a contract, such as testified by Robinson, is valid.

Section 13 of the act of congress entitled "An act to appropriate the proceeds of the sale of the public lands, and to grant pre-emption rights," approved September 4, 1841, vol. 5, U. S. Statutes at Large, 456, provides: "That before any person claiming the benefit of this act shall be allowed to enter such lands, he or she shall make oath before the receiver or register of the land district in which the land is situated (who are hereby authorized to administer the same) that he or she has never had the benefit of any right of pre-emption under this act; that he or she is not the owner of three hundred and twenty acres of land in any state or territory of the United States, nor hath he or she settled upon and improved said land to sell

the same on speculation, but in good faith to appropriate it to his or her own exclusive use or benefit; and that he or she has not, directly or indirectly, made any agreement or contract, in any way or manner, with any person or persons whatsoever, by which the title which he or she might acquire from the government of the United States should inure in whole or in part to the benefit of any person except himself or herself; and if any person taking such oath shall swear falsely in the premises, he or she shall be subject to all the pains and penalties of perjury, and shall forfeit the money which he or she may have paid for said land, and all right and title to the same; and any grant or conveyance which he or she may have made, except in the hands of *bona fide* purchasers, for a valuable consideration, shall be null and void."

At the time the agreement between Robinson and Jones is alleged to have been made this section was in full force, and the land was obtained by the latter under its provisions. It is obvious that congress intended that land acquired under this law should be for the exclusive use and benefit of the pre-emptor. That was the object and purpose in requiring the person applying for the entry of a pre-emption to make oath "that he or she has not, directly or indirectly, made any agreement or contract, in any way or manner, with any person or persons whatsoever, by which the title which he or she might acquire from the government of the United States should inure in whole or in part to the benefit of any person except himself or herself." It is certain that Jones could not have pre-empted this land in the name of Robinson, or any person except himself. To create the right of pre-emption it is absolutely necessary that there be settlement, habitation, and improvement by the pre-emptor, and the pre-emptor himself must make the affidavit required by the section above quoted. Robinson had never settled upon or improved the land. He had neither complied, nor attempted to comply, with any

of the provisions of the pre-emption act.    To hold that he became the equitable owner of the land would be contrary to the spirit and meaning of that law.    Again, if the agreement set up by the plaintiff was ever in fact entered into, Jones could not have pre-empted the land without having committed perjury.    A contract resting upon perjury is illegal and void.    It follows that a trust cannot be declared in favor of the plaintiff. (*Warren v. Van Brunt,* 19 Wall., 646 ; *Dawson v. Merrille,* 2 Neb., 119 ; *Anderson v. Carkins,* 10 Supreme Court Reporter, 905; *Oaks v. Heaton,* 44 Ia., 116; *Mellison v. Allen,* 30 Kan., 382; *Nicholas v. Council,* 9 S. W. Rep., 305; *St. Peter Co. v. Bunker,* 5 Minn., 153; *Evans v. Folsom,* Id., 342; *Bruggerman v. Hoerr,* 7 Id., 264.)

*Warren v. Van Brunt, supra,* is a case precisely in point.    There Van Brunt had acquired title to certain lands under the pre-emption laws, and Warren sought to have it declared that Van Brunt held the title to the land in trust, for the use and benefit of the plaintiff.    The court, in passing upon the question, says, p. 654: "But such a contract cannot be enforced to any extent.    The pre-emption laws provided, at the time of this entry and purchase, that before any person should be allowed to enter lands upon a claim for preemption, he must make oath that he had not, directly or indirectly, made any agreement or contract, in any way or manner with any person, by which the title he might acquire by his purchase should inure in whole or in part to the benefit of any person except himself.    Forfeiture of title to the land purchased, and of the money paid for it, was made the penalty of false swearing in this particular. An entry could not have been made, therefore, by Van Brunt in trust for Warren; and if it could not have been made, a court of equity will not decree that it was.    All contracts in violation of this important provision of the act are void and are never enforced."

It cannot be successfully claimed that Robinson was not

*in pari delicto,* hence he can enforce the illegal contract. As was said by Mr. Justice Brewer in his opinion in *Anderson v. Carkins, supra,* "we are unable to see any distinction in moral *status* between the man who contracts for the perjury of another and the one who contracts to commit such perjury. The fact that the former party may have parted with money, or valuable property, does not change the quality of his action, or give him higher claim to the consideration of a court of equity."

We have examined the numerous cases cited by appellee holding pre-emptor's trustees of lands acquired by preemption. In each case the contest was between two preemptors, each claiming the land in dispute by reason of his settlement and improvement. Those authorities hold, and we think correctly, that the person making the first actual settlement and improvement was entitled to the land, but they are not applicable to the question involved in the case at bar.

It is also insisted by counsel for appellee that *Brush v. Ware,* 15 Peters, 104, is decisive of this case. The facts, as disclosed by the report of that case, are briefly these: One Hockaday was a captain in the war of the revolution, and on account of such service he was, under an act of congress, entitled to certificates of 4,000 acres of land in the Virginia reservation in the state of Ohio. Hockaday died and a man by the name of Ware was appointed his executor. Ware obtained certificates for the lands and fraudulently assigned them to Ladd, who located them. After the land was patented, Ladd sold a portion to Brush. An action was brought by the heirs of Hockaday to recover the land. The court sustained the action. The pre emption law was not involved in that case. Had the land upon which Jones located the warrant been subject to private entry the decision in the cited case would be in point.

Can the judgment entered in this case be upheld upon the theory that no agreement was entered into between

Robinson and Jones for the location of the warrant, but was placed in Mrs. Reeves's hands to keep for Robinson, and that Jones received and used the same with full knowledge that it was the property of the plaintiff? Robinson could undoubtedly follow the warrant into the land and have a trust declared in his favor, were it not that the land was not subject to private entry, and a title thereto could only be acquired under the pre-emption act. As that law prohibited Jones from obtaining the title in trust for any person, the law will not raise a trust in favor of the plaintiff. It will not compel Jones to do what he could not lawfully contract. To enforce a trust in this case would be taking the land from the one who made the settlement, improvement, and entry to give it to one who had not in any manner complied with the law under which title could be obtained from the government. It would be giving Robinson the benefit of Jones's pre-emption right and make the title acquired by Jones's entry inure to the benefit of another. This the law will not permit. (Perry on Trusts, sec. 131; 2 Story, Eq. Jur., sec. 1201 b; *Leggett v. Dubois,* 5 Paige, 114; *Warren v. Van Brunt, supra.*)

As already stated, the testimony contained in the record is very conflicting. Is it established by a preponderance of the evidence that Robinson did not donate the warrant to Mrs. Reeves, but that she was to hold it for him? Mrs. Reeves is the only witness who testifies that she was to keep the warrant for plaintiff until he should return from California. She is contradicted by Robinson and Mr. and Mrs. Jones. The subsequent conduct of the plaintiff is entirely inconsistent with the theory that Mrs. Reeves was keeping the warrant for the plaintiff. His failure to inquire of her about it for more than thirty years is a strong circumstance tending to show he had no interest therein. Nor is it at all likely Mrs. Reeves would have given the warrant to Jones to use had it been left with her for safe keeping. The giving of the power of attorney by Rob-

inson to Jones, empowering him to assign the warrant to the old lady, if one was given, strengthens the claim of the appellants that the land warrant was given by the plaintiff to her for her own use and benefit. Robinson denies that such a power ever existed. Jones and his wife both testified that it was made and was, years afterwards, lost. They appear to be persons of integrity. On the trial the plaintiff called them as witnesses to testify in his behalf. While he was not concluded by their testimony, yet, by making them his witnesses, he in effect says that their statements under oath are generally entitled to credit. The judgment of the trial court was based upon the testimony of Mrs. Reeves. True, she was a disinterested witness, and we have no doubt she gave the facts as she remembered them. But the transaction testified to by her occurred nearly forty years before she gave her testimony. At the time of the trial she was eighty-nine years old, and was nearly blind and deaf. It would not be strange, after the lapse of so many years, if her memory was not altogether accurate as regards what really occurred. The burden was upon the plaintiff to establish by a clear preponderance of the evidence the essential facts relied on to create a trust. We conclude, therefore, that the evidence of Mrs. Reeves is not sufficiently clear, certain, and convincing as to authorize its acceptance to the rejection of the testimony of the plaintiff and Mr. and Mrs. Jones.

We have reached this conclusion without taking into consideration the deposition of Elizabeth Reeves, which appears to have been taken after the trial court had announced what the decision in the case would be. It was on file before the judgment was actually rendered, and the bill of exceptions discloses that it was inspected by the trial court, but was not considered, on account of not being formally offered in evidence. In this deposition Mrs. Reeves testified, in effect, that she went to Missouri after the warrant because it belonged to her. Her deposition

tends to weaken the testimony she had previously given before the court, but as it was not offered in evidence in the court below it cannot be considered here. Had it been offered by the defendants it ought, and doubtless would, have been received and considered as evidence.

Other questions are discussed by counsel, such as that the action is barred by the lapse of time and statute of limitations, which we will not consider, as we have already reached the conclusion, for the reasons already stated, that the plaintiff cannot maintain this action. The judgment will be reversed and the action

DISMISSED.

THE other judges concur.