Decided 2 June, 1903.

## HORSEMAN *v.* HORSEMAN.

[72 Pac. 698.]

| 43 | 83 |
| 43 | 153 |

PUBLIC LANDS—AGREEMENT TO CONVEY HOMESTEAD.

1. A contract to convey the land that he has entered under the laws of the United States made by a homestead claimant before the issuance of a patent is void and unenforceable in the courts, since it is a violation of the public policy of the national government, as indicated by Sections 2290 and 2291 of the Rev. Stat. U. S., which require that lands entered as homesteads must be for the purpose of actual settlement by the claimants, and that the patent shall issue only on the affidavit of the entrymen that no part of the land has been alienated.

SEVERABILITY OF CONTRACT—SPECIFIC PERFORMANCE.

2. A contract to convey for a fixed total sum certain specified real and chattel property, together with the land covered by a homestead entry on which final proof had not been made, is an entire indivisible contract, and enforceable only as a whole.

ENFORCEMENT OF PARTLY VOID CONTRACT—EQUITY.

3. Equity will not undertake to aid either party to a void contract in any way, but will leave them just where they have placed themselves.

RESTORING PARTIES TO THEIR ORIGINAL POSITIONS.

4. In enforcing the rule that parties to contracts against public policy shall be left where equity finds them it is sometimes necessary to enter a judgment against one of the parties for the value of property received from the other during the litigation, and equity will use appropriate means and orders to restore all the parties to their original positions before dismissing them.

From Umatilla: W. R. ELLIS, Judge.

This is a suit by J. A. Horseman and Eugene Corley against Chas. H. Horseman. The complaint sets up the execution on February 17, 1898, by plaintiffs to defendant, of two promissory notes, for $1,000 and $2,250, respectively, payable one and two years after the date thereof, with interest at 10 per cent per annum, said notes being given for the balance of the purchase price of defendant's interest in all the horses, cattle, and real property then

owned by the firm of Horseman Brothers, composed of the plaintiff, J. A. Horseman, and the defendant, Charles H. Horseman; that defendant delivered to plaintiffs all his interest in such personal property, and conveyed to them all his interest in the real property, except two quarter sections, namely, the southwest quarter of section 19, and the northwest quarter of section 30, township 3 south, range 30 east, Willamette Meridian; that, to secure the payment of said promissory notes, the plaintiffs at the same time executed and delivered to defendant a chattel mortgage upon 213 head of stock cattle, and also mortgages upon all of the deeded lands theretofore belonging to the firm; that thereafter it was agreed by and between the plaintiffs and defendant that if at any time the plaintiffs could sell any of the cattle covered by the chattel mortgage, and thereby raise sufficient funds, the defendant would accept the amount due on such notes, with accrued interest to the date of payment, surrender the same, and cancel the mortgages, and that for such purpose the plaintiffs were authorized to dispose of any and all of said cattle; that thereafter the plaintiffs sold sufficient of such cattle, together with other cattle belonging to them individually, to realize enough money to pay said notes, and on the seventeenth day of May, 1898, tendered to the defendant the full amount thereof, with interest accrued to that date, which defendant refused to accept, and did then and does now refuse to surrender said notes or cancel the mortgages, or to convey to plaintiffs the said two quarter sections of land above described, although demanded so to do. The prayer is for a decree requiring a surrender of the notes and the cancellation of said mortgages upon payment of the principal sum due thereon and interest to May 17, 1898, and the execution and delivery by defendant to plaintiffs of a proper conveyance of the said two quarter sections of land, and for general relief. The answer admits

the execution of the notes and mortgages, but denies that defendant sold or agreed to convey the southwest quarter of section 19, or the northwest quarter of section 30, and prays damages for the alleged conversion of some horses, which it avers were excepted from the sale. The trial court's findings of fact conformed closely to the allegations of the complaint, in addition to which it found that by its order of October 23, 1899, the clerk of the court was appointed receiver to take charge of the money, notes, and mortgages mentioned in the complaint; that there are in his custody $2,635.40, the note for $2,250, and the mortgages; that, of the sum of $2,700 originally deposited in the First National Bank of Pendleton, and delivered by it to the clerk, $2,271.25 are the proceeds of the sale of the cattle described in the chattel mortgage. It thereupon decreed a dismissal of the suit, without prejudice; that the clerk indorse upon the said note of $2,250 the sum of $2,271.25, and thereupon deliver said sum and the notes, and mortgages made to secure the same, to the defendant. From this decree the plaintiffs appeal.        MODIFIED.

For appellants there was an oral argument by *Mr. Thos. G. Hailey*, with a brief over the names of *T. G. Hailey* and *John J. Balleray*, to this effect :

1. A contract made by a homestead claimant after entry and after the required residence thereon, to convey his homestead after final proof, is valid : Rev. Stat. U. S. § 2291; *Knight* v. *Leary*, 54 Wis. 459 (11 N. W. 600, 605); *Townsend* v. *Fenton*, 30 Minn. 528 (16 N. W. 421).

2. The word "alienate" has a technical legal meaning, and any transfer of real estate short of a conveyance of the title is not alienation : 2 Am. & Eng. Ency. (2 ed.), p. 61, note ; *Gould* v. *Head*, 41 Fed. 245 ; *Hammel* v. *Queen's Ins. Co.* 54 Wis. 72 (11 N. W. 349, 72 Am. Rep. 1) ; *Union Ins. Co.* v. *Barwick*, 36 Neb. 223 (54 N. W. 519, 521).

3. A timber-culture claimant may contract before final proof to sell his claim: *Adams* v. *Church*, 37 Or. 355 (61 Pac. 639).

4. It is not generally necessary that the vendor be able to furnish a good title at the time of the contract if he be able to do so at the time of the suit: *Dodson* v. *Hayes*, 29 W. Va. 577 (2 S. E. 424); *McKinney* v. *Jones*, 55 Wis. 39 (12 N. W. 381); *Arnett* v. *Smith*, 11 N. D. 55 (88 N. W. 1041).

For respondent there was an oral argument by *Mr. A. D. Stillman* and *Mr. W. M. Pierce*, with a brief to this effect:

In February, 1898, the defendant was holding as entryman 160 acres under the homestead laws (Rev. Stat. U. S. §§ 2290, 2291) of the United States. He had not even attempted to make final proof. There is no evidence that he had resided upon it the requisite length of time or made the required improvements. A contract made at that time to execute a conveyance of the land homesteaded would be null and void as against public policy: *Clark* v. *Bayley*, 5 Or. 343; *Warren* v. *Van Brunt*, 19 Wall. 646; *Robinson* v. *Jones*, 31 Neb. 20 (47 N.W. 480); *Oaks* v. *Heaton*, 44 Iowa, 116; *Marshall* v. *Combs*, 48 Ark. 362 (3 S. W. 188); *Mellison* v. *Allen*, 30 Kan. 382; *Anderson* v. *Carkins*, 135 U. S. 483 (10 Sup. Ct. 905); *Damrell* v. *Mayer*, 40 Cal. 166; *Huston* v. *Walker*, 47 Cal. 484.

MR. JUSTICE WOLVERTON, after stating the facts in the foregoing terms, delivered the opinion.

It is established by the evidence adduced that on and prior to the sixteenth day of February, 1898, the plaintiff J. A. Horseman and the defendant Charles H. Horseman were partners, engaged in the stock business, under the firm name of Horseman Bros.; that the firm owned a large number of horses and cattle, and was in possession and occupancy of a large tract of land used in connection with the business, and on that date the defendant agreed, for

the consideration of $4,250, to sell, transfer, and convey
all his interest in the partnership property, including
stocks and lands, to the plaintiffs; that G. L. Horseman
acted as the agent of plaintiffs in making the agreement,
and to bind the bargain he paid defendant $40, and took
his receipt therefor, as follows:

"Pendleton, Oregon, Feb. 16, 1898.
    Rec'd of G. L. Horseman forty dollars ($40 $^{00}/_{100}$) as part
payment on the property of the interest of C. H. Horseman
in the Horseman Bros. estate of which I, G. L. Horseman,
agree to pay $4,250 $^{00}/_{100}$ for after the money that is all
ready on hands is divided $\frac{1}{2}$ and $\frac{1}{2}$.
                                C. H. HORSEMAN."

It is also established that on the next day Charles H.
Horseman executed to plaintiffs a deed to certain lands that
stood in his name individually, but were in reality part-
nership property, and the plaintiffs executed and deliv-
ered to him the notes and mortgages mentioned in the
complaint, $1,000 of the agreed consideration being paid
in cash before the exchange of such instruments; that it
was agreed on the day the receipt was given that the de-
ferred payments were to be made on or before one and
two years after date, to suit the convenience of the pur-
chasers, but that G. L. Horseman, the agent, omitted to
state this condition to his attorney, and the notes were
drawn payable one and two years, respectively; that on
the 17th, and prior to the exchange of the papers, the
mistake was discovered, and that it was then mutually
agreed that the makers should be permitted to discharge
such notes at any time the cattle covered by the chattel
mortgage could be sold to realize the funds, by paying the
principal and interest accrued to that time, and for that
purpose defendant authorized the plaintiffs to dispose of
the cattle. As to this latter agreement the parties are not
in accord, the defendant denying it *in toto*, but G. L. Horse-

man testifies positively in affirmation of it, and the defendant undeniably assented to the sale of the cattle covered by the mortgage, so that money could be realized upon them; and we are firmly of the opinion that such an agreement was entered into with reference to the sale of the stock and discharge of the notes, as stated.

It is further shown that the cattle, or a part of them at least, were sold on and prior to the seventeenth of May, the proceeds of which, together with $1,160 realized from other cattle belonging to plaintiff Corley individually, were sufficient to pay the notes and accumulated interest to that date. But when G. L. Horseman, acting as the agent of plaintiffs, indicated their readiness to pay, the defendant refused to accept the principal and interest to that time, or to surrender the notes, until the face thereof, with interest to the dates of their maturity, was fully paid. G. L. Horseman testifies that he made a tender of the amount due according to his understanding in full payment, but on condition that the defendant execute and deliver to the plaintiffs a deed to his homestead, consisting of the northwest quarter of section 30, and the defendant admits that a tender was made to Mr. Wade, his agent, but declined by his direction, his instructions being to accept nothing less than the face of the notes in payment thereof. Mr. Wade, the cashier of the First National Bank of Pendleton, testifies that the defendant left the notes with the bank; that a few months afterward G. L. Horseman, representing the plaintiffs, and the defendant came into the bank, the former saying he wanted to pay the notes; that a dispute arose between them relative to the interest, the defendant insisting upon the full amount according to the tenor of the notes, although they were not then due. He further says, employing the language of the witness: "I counseled with them some, and they finally agreed that, until they could settle it otherwise, that they would leave this certain sum

of money, the face of these two notes and interest for the full time, in my hands in escrow to take up these notes as they came due. One of these notes afterwards came due, and I paid to Charles Horseman the amount of the money and gave the note to George Horseman, and took Charles Horseman's receipt for the money. The rest of the money was afterwards turned over to the county clerk on order of the court." Then being asked, " Mr. Wade, what instruction did you get from George at the time he left the amount of money in there, as you say, to pay the full amount of the note according to tenor ?" he answered as follows : " He told me the understanding was between the two I was not to turn the money over to Charlie Horseman until they came due, unless otherwise instructed. I was to hold them until that time, and was not to pay any of it until it came due, and, if they agreed on a compromise of any kind, they would let me know."

The principal dispute in the evidence is whether the homestead of the defendant and another tract of land, being the said southwest quarter of section 19, upon which defendant had filed a timber culture claim, were included in the transaction of February 16, 1898. The property involved is the defendant's interest in the " Horseman Bros. Estate," whatever that may be. In 1890, during the early existence of the co-partnership, the defendant purchased, with partnership assets, of one J. L. Hall his preemption claim, taking a deed therefor in his own name, also certain rights not clearly defined in the two quarter sections of land, which defendant afterward entered, one as a homestead, the other as a timber culture, paying for the whole money and property equivalent to $1,500 ; the value of the right to the homestead and the timber culture being estimated at $300. About the same time the defendant purchased other lands with the partnership funds, taking the title in his individual name. All these lands have

since been used and employed in connection with the partnership business, and treated, managed, and controlled as partnership assets, including both the homestead and the timber culture tracts. The main improvements are upon the homestead, which constituted the realty of chief value to the business of the firm. J. A. Horseman, G. L. Horseman, and Frank Spike, who were in part instrumental in bringing about the agreement, all testify that it was understood and especially mentioned that the homestead and timber culture were included in the agreement to sell ; and, while defendant denies that such was the case, he made admissions, immediately after the agreement was entered into, to Ben and Tom Ogle, that he had sold all his interest in the Horseman Bros. Estate, and that he was to deed some of the land as soon as he proved up on it. He executed a deed to all the lands standing in his name, and it is further shown that he surrendered possession of all except the homestead, and possibly the timber culture, at once ; but as to these he surrendered possession to the purchasers after he had made final proof upon the homestead, which occurred April 8, 1898. From this testimony, and the conduct of the defendant relative to the homestead and timber culture claims, we are impelled irresistibly to the conclusion that both were included in the agreement to sell and convey, and were considered as constituting a part of the Horseman Bros. Estate, and that it was so understood by all the parties to the contract of sale. These are, in substance, all the facts necessary to be noticed in the determination of this case.

Counsel for plaintiffs makes two contentions: (1) That plaintiffs are entitled to have the notes delivered up to them, and the mortgages executed to secure their payment canceled; and (2) that they are entitled to a deed from the defendant to his homestead. Defendant's counsel controvert both these contentions, and insist that the

alleged agreement on the part of the defendant to sell and convey his homestead to the plaintiffs is against public policy, having been entered into prior to the issuance of the patent therefor, and therefore that equity will not interfere to enforce it.

1. We will inquire first as to the validity of the agreement. Prior to March 3, 1891, any person applying to enter land as a homestead was required to make and file an affidavit deposing that his application was made for his exclusive use and benefit, for the purpose of actual settlement and cultivation, and not either directly or indirectly for the use or benefit of any other person : Rev. Stat. U. S. § 2290. The amendment of March 3, 1891 (chapter 561, § 5, 26 Stat. 1097), makes some changes, but the section remains substantially the same as to the provisions noted : See U. S. Comp. Stat. 1901, p. 1389, § 2290. By the section next succeeding it is provided that no certificate or patent shall issue, except upon affidavit of the entryman, his widow, heirs, or devisees, that no part of such land has been alienated, except, as provided in a previous section, for church, cemetery, or school purposes, etc. This statute has received explicit consideration by the federal supreme court, which tribunal has declared it to be the purpose of the general government by the enactment to secure homesteads to actual settlers, whose intent and purpose it is to occupy and cultivate the lands; that it is the manifest policy of the government to interdict alienation by the settler until he has performed upon his part all that is ' required of him for the acquirement of the title, and that the exaction of the affidavit of nonalienation is a clear expression of the legislative intent in that relation ; that a contract to convey, made during the transition period, having for its purpose the execution of a regular conveyance of the title when acquired, is an alienation, within the spirit and purpose of the statute, and is therefore illegal

and void; that the consummation of such a contract would necessarily rest in perjury, presumably within the contemplation of both vendor and purchaser; and that courts will refuse to enforce such a relation, not from any regard to the vendor, but from suggestions and motives of public policy: *Anderson* v. *Carkins*, 135 U. S. 483 (10 Sup. Ct. 905).

And the undoubted preponderance of the adjudications of the state courts is to the same purpose. Mr. Justice BREWER, while a member of the Supreme Court of Kansas, said "that, whether the contract be absolutely void or not, it is so clearly against the will and policy of the government, and so necessarily resting upon perjury, that a court of equity will have nothing to do with it": *Mellison* v. *Allen*, 30 Kan. 382, 385 (2 Pac. 97, 99). Again, in *Dawson* v. *Merrille*, 2 Neb. 119, 124, it is said: "These provisions, if they do not directly prohibit the making of this contract, do yet most clearly indicate a policy adverse to such contracts. The cases are numerous in which it has been held that such contracts are void. * * The court will not lend its aid to the enforcement of such contracts by decreeing their specific performance or otherwise." So, in *Oaks* v. *Heaton*, 44 Iowa, 116, 120, the court say: "If plaintiff had agreed with defendant that plaintiff would abandon his preëmption claim in consideration that defendant would convey to plaintiff one half the land, and then go before the register or receiver of the land office and falsely make affidavit that no part of the land had been alienated, and thus, by perpetrating a fraud upon the government and committing a felony, obtain a patent for the land, no one, probably, would claim that any court could lend its aid to the enforcement of the agreement. Although not in words so expressed, yet such is precisely the effect of the agreement which the plaintiff seeks to enforce." And this court has said, having the statute in view: "If Thorn could not lawfully have made, in express

terms, a contract of this kind, none will be implied, and
equity will not decree any relief in such a case": *Clark* v.
*Bayley*, 5 Or. 343, 352.   See, also, *Robinson* v. *Jones*, 31 Neb.
20 (47 N. W. 480).

2.  A court of equity will therefore not help parties, find-
ing them in the position of contracting, whereby they have
in contemplation, by necessary implication or otherwise,
an infraction of the law for the consummation of their
mutual purposes, but will leave them where it finds them.
It will not assist the party that may be benefited by such
a fraud upon the government, and it cannot, for the same
reason, aid the party that might be injured by the non-
execution of the undertaking.   The contract of the parties
to this cause falls clearly within the interdiction of the
statute.   There was an undertaking by defendant to con-
vey his homestead to plaintiffs after he acquired the title
from the government or had proved up, and, although he
remained in possession until he made final proof, that cir-
cumstance does not validate the contract.   He had alien-
ated the land, contrary to the spirit and policy of the
law, when he sold and agreed to convey, and hence could
not afterward make his final proof without an infraction
thereof, and the plaintiffs necessarily contemplated ac-
quirement of title through such illegal course.

"Where," say the learned authors of the American &
English Encyclopedia of Law (2 ed.), vol. 15, p. 988, "a con-
tract which is entire contains a stipulation or agreement
which. is illegal, and which, therefore, is not severable
from the balance of the contract, such illegal stipulation
or agreement cannot be ignored and the other provisions
of the contract enforced.   The illegal stipulation or agree-
ment in such a case penetrates and corrupts the whole con-
tract, and vitiates it as an entirety."  But it is argued that
the contract here involved is severable, so that the court
may enforce the good, and leave the parties without relief

as to the bad. We cannot concur in that view. Quoting again : "A contract may be said to be entire when, by its terms, nature, and purposes, it contemplates and intends that each and all of its parts, material provisions, and the consideration are common each to the other and interdependent. A divisible contract is one in its nature and purposes susceptible of division and apportionment, having two or more parts in respect to matters and things contemplated and embraced by it, not necessarily dependent upon each other, nor intended by the parties to be so": 15 Am. & Eng. Ency. Law (2 ed.), p 988. By the present contract the property was sold in a mass, for the lump consideration of $4,250, without specific designation or agreement as to the value of particular items thereof, each and all of its parts being common to each other and interdependent, so that it is clearly an entire contract, within the definition above given. For a case of marked analogy see *Wehrung* v. *Denham*, 42 Or. 386 (71 Pac. 133).

3. This conclusion renders it unnecessary to consider whether plaintiffs are entitled to have the notes delivered and the mortgages canceled, for the court will leave the parties where it found them, without rendering aid or relief to either. It will not enforce a specific performance relative to the conveyance of the homestead, neither will it require a surrender or cancellation of the unpaid note and mortgages, or interfere to relieve against the condition in which the parties have voluntarily placed themselves. As found by the trial court there was in the hands of the clerk $2,271.25 in money which the plaintiffs realized from the cattle covered by the alleged chattel mortgage, which had been paid into the First National Bank of Pendleton by plaintiffs, and transferred by order of the court to the clerk. This money was not paid in execution of the contract, but was deposited in the bank with the understanding that, until the parties should settle the dispute other-

wise—that is, as to the amount of money necessary to discharge the notes—it should be used to take up the notes as they became due. One of them was taken up before the money came into the custody of the court, but the other never has been, and the dispute resulting in this litigation has never been settled. It was error, therefore, to direct the clerk to indorse this sum on the note, and to deliver the same to the defendant, as such disposition of the fund was an enforcement in part of the contract. The money should have been returned to plaintiffs, and the note to the bank, its custodian for defendant.

4. Assuming that the decree has been carried into effect, and the money paid over by the clerk to defendant as directed, the decree of this court will be that plaintiffs have and recover of and from the defendant the sum of $2,271.25, with legal interest from the date of such decree, together with their costs and disbursements on this appeal, and that otherwise the cause be dismissed without prejudice to the parties.　　　Modified.