## OLSEN et al. v. BANK OF EPHRAIM (RASMUSON et al., Interveners).

No. 5817.   Decided May 19, 1937.   (68 P. [2d] 195.)

Rehearing Denied November 8, 1937.

*Stanley W. Johnson,* of Ephraim, for appellants.

*Jensen & Jensen,* of Ephraim, for respondents.

LARSON, Justice.

This is an appeal, upon the judgment roll, from the district court of Sanpete county. The only error assigned is that the conclusions of law and judgment are not supported by and are contrary to the findings of fact. The facts are simple, though the findings are somewhat extended and in detail. Since we are called upon to decide what the judgment should be under the facts as found by the court, it becomes necessary to set out the essentials of the findings of fact at some length. The exceptions to the conclusions of law and the judgment admit, for the purposes of the exceptions, that the facts are fully and correctly found by the trial court. *Meier* v. *Union Trust Co.,* 93 Ind. App. 457, 176 N. E. 42; *Matson* v. *Matson,* 56 Utah 394, 190 P. 943; *Walb Construction Co.* v. *Chipman,* 202 Ind. 434, 175 N. E. 132. The essential facts follow:

That three of the plaintiffs are minor children of Anthon Olsen and Emma Olsen, his first wife; that the other plaintiff, Howard L. Olsen, also a son of Anthon and Emma Olsen, was until shortly before the action was commenced also a minor; that said Olsens had five other children who had attained their majority some time prior to the commencement of the action; that the defendant Bank of Ephraim is a banking corporation, and defendant F. H. Rasmuson was its cashier and defendant C. Willardsen was its vice president; that during the year 1919, Anthon Olsen was the owner

of certain lands, sheep, and grazing permits for sheep on the Manti National Forest; that in November, 1919, he purchased from one Stevens 200 acres of land and about 200 head of sheep with a permit to graze said sheep in the Manti National Forest, for the sum of $5,600, which sum was borrowed from the defendant Bank of Ephraim; that Olsen was otherwise indebted to the bank in the sum of $3,900; that the Olsens, to secure payment of both said sums, totaling $9,500, mortgaged to the bank the property purchased from Stevens, together with other property; that at the time of the purchase from Stevens, Olsen, "in order to avoid a reduction in the number of sheep which would thereafter be permitted to graze upon the Manti National Forest in case the same were transferred to Anthon Olsen, and for no other purpose, said Anthon Olsen caused said land to be conveyed by warranty deed, and the title to said sheep to be conveyed by bill of sale from Henry I. Stevens, to Emma C. Olsen, who was then the wife of said Anthon Olsen * * *"; that said Emma C. Olsen died intestate in January, 1920, and left surviving her, her husband, Anthon Olsen, and nine children, ranging from eleven days to thirteen years of age, the four youngest of whom are the plaintiffs herein. That in 1920, Anthon Olsen, upon his own petition, was appointed administrator of his deceased wife's estate; that he filed an inventory and appraisement in the probate proceeding showing the property of the estate to consist of the land and sheep purchased from Stevens and $420 received from the sale of wool from the sheep in 1920; that notice to creditors was published in the probate proceeding but the bank did not present a claim; that in September, 1920, on petition of Anthon Olsen, the district court entered an order allowing the final account and entered a decree of distribution in the estate of Emma C. Olsen, in which decree the court found that Anthon Olsen by proper warranty deed and bill of sale had transferred all his interest in the land, sheep, and money to his children, and the court by decree distributed all such property to the nine children in undivided portions.

That in 1931, Anthon Olsen on his own petition was appointed guardian of the estates of the plaintiffs, the other children having attained their majority; that in his petition for appointment as guardian, Anthon Olsen set forth that the minors, plaintiffs herein, were each the owner of a one-ninth interest in the lands bought from Stevens of the estimated value of $333.30, 100 head of sheep valued at $400, and a permit privilege of an estimated value of $433, and that the minors had owned such property since 1920; that defendants Rasmuson and Willardsen signed, as sureties, the guardianship bond of Olsen in the sum of $1,290; that Olsen as guardian filed an inventory and appraisement, showing the minors each to be the owner of a one-ninth interest in the land valued at $333.30, and "100 head of sheep covered by permit on Manti National Forest, value $833.00"; that in 1932, Olsen as guardian petitioned the court for leave to sell the property of the minors, "which came to them in 1920, by inheritance and gift," for the reason that for a year past the property had netted no income and a sale would best subserve the interest of the minors; that sale was authorized by the court, sale to the bank made pursuant to an agreement between Olsen and the bank before Olsen's appointment as guardian, and return of sale made to the court; that in June, 1932, the court confirmed the sale in an order reciting, inter alia, that the sale was of real estate, sheep, and permit to graze on the Manti National Forest; that the purchase price was kept by the Bank of Ephraim and credited on Olsen's debts; that the children of Anthon and Emma C. Olsen, who had attained their majority before the guardianship proceedings were commenced, by warranty deed and bill of sale had conveyed their interests to the Bank of Ephraim.

That from the time of purchase from Stevens in 1919 to 1923, all of the property so purchased had been under mortgage to the Bank of Ephraim for the purchase price; that in 1923, Olsen borrowed money from the North Sanpete Bank and paid the Bank of Ephraim in full and the latter's mortgages were released and discharged; that Olsen mort-

gaged the property, except a one-third interest in the real estate, to the North Sanpete Bank to secure his loan there covering other indebtedness besides what was owing on this property, which mortgage was renewed from time to time until 1931 by Olsen, always without leave of court and as his own property, and the original indebtedness of $9,500, of which $5,600 was purchase price, had been reduced between 1919 and 1931 to $6,000; that in 1930, Olsen mortgaged the sheep but not the land bought from Stevens, to the Bank of Ephraim, and paid off his debts at the North Sanpete Bank; that from 1919 to 1931, Olsen kept the management, possession, and control of the sheep and land; that he branded the sheep and their increase with his own mark and carried the permit in the name of "Emma C. Olsen estate"; that he received the use and benefit of the land and sheep and used them as his own; that he represented to Rasmuson that the property was his but the title in the name of his children; that Olsen had sold the sheep and land involved in this action by an agreement with the defendant bank before his appointment as guardian, and the guardianship proceedings were had for the purpose of effectuating such sale in regard to record title; that neither Emma C. Olsen nor the minor children paid any money or property of value for the property in question. We copy finding of fact No. 11 in full:

"The court further finds that from the year 1919 up to the year 1931, all of the said minor children of the said Anthon Olsen and his deceased wife Emma C. Olsen resided with and were supported and maintained and educated by Anthon Olsen; that during said time Anthon Olsen was engaged in the business of raising sheep; that up to the year 1926 Anthon Olsen was able to support his said children not of his own income, but from and after the year 1926 he was not able to support himself and his said children out of his own income, and he used all of the income from the said property, including all of his own income, for the support of himself and his family, and he so reported to the court in the guardianship proceedings above mentioned.

"The court further finds that it cost Anthon Olsen about $10.00 per month during said period of time 1926 to 1931 to support, educate, and maintain each of his said minor children."

The court further found that the legal title was in Emma C. Olsen and later in her children, but the equitable title was always in Anthon Olsen.

Upon the foregoing facts the court held that the property belonged to Anthon Olsen, that he could lawfully sell the same, and entered judgment for defendants. It is to reverse this judgment that the case is brought here. The questions presented for determination on this appeal are:

(1) Will an equity court recognize equitable title in this father who purchased property and took title thereto in his wife's name for the sole purpose of deceiving the U. S. Forest Service as to whom the owner of the property was, thus getting around a rule of said Forest Service, the action of which rule would have reduced the number of sheep which could have been grazed on the National Forest under the permit right purchased, had title been taken in his own name?

(2) If the above question is answered in the affirmative, can this equitable title still be asserted after the action taken by the father in the probate of his wife's estate and in the guardianship proceedings?

(3) If question (2) be answered in the affirmative, did the father properly present in the guardianship proceedings and did the court properly allow an account which showed that the father was entitled to a net credit against plaintiffs of $932 or more?

(4) If question (3) is answered in the negative, did the court authorize the father to apply the sale price on his personal debt to the defendant bank, and if it did this, did it have the power so to do?

(5) Was there a purchase-money mortgage or lien against the property in 1931 and, if so, was this mortgage or lien ever foreclosed so as to terminate any interest which plaintiffs had in the property?

(6) Can a guardian's bondsmen collaterally attack the wards' title to their property in an action in which they ap-

pear of their own volition and ask for the allowance of an account?

We shall discuss these questions seriatim: (1) The defendants admit the legal title to the property involved in this action was in appellants, but contend that the equitable title was in Anthon Olsen, their grantor, of a one-third interest, and that because he paid for the property in 1919, a trust resulted in his favor as the holder of the equitable title. That an equitable title may be raised in favor of one who pays the purchase price, though title be taken in a third person, or that a trust may result in favor of such person, or in some cases even in favor of the grantor, is settled beyond argument. But when the grantor, or the third person who paid the purchase price, seeks to establish such trust, or to have a court of equity decree his ownership, as against the holder of the legal title, he must come into court with clean hands. The transaction by which title was vested in another party must be honest. No such title can arise or be established from acts contrary to public policy nor in favor of the guilty party out of acts which have their origin in a fraudulent purpose. Perry on Trusts (6th Ed.) § 165; *Sell* v. *West*, 125 Mo. 621, 28 S. W. 969, 46 Am. St. Rep. 508; *Derry* v. *Fielder*, 216 Mo. 176, 115 S. W. 412. It is a universal rule that no one can claim a right through the fraud of himself or another. Ex turpi causa non oritur actio. No resulting trust can spring from an act contrary to a statute or to public policy. The rule is founded upon honesty and fair dealing and courts of equity do not permit the parties to such transactions to reap any benefits therefrom. The law will not permit a party to deliberately put the property out of his control, or the title thereto in another, for a fraudulent purpose, and then, through the intervention of a court of equity, to regain the same after his fraudulent purpose has been accomplished. Having conveyed his property for the fraudulent purpose of defeating the claims of others or to acquire an untoward advantage to himself, the law will leave him where he placed himself. Both his mouth and those of

his assigns are closed to question the validity of the conveyance. *Miller* v. *Marckle*, 21 Ill. 152; *Kirkpatrick* v. *Clark*, 132 Ill. 342, 24 N. E. 71, 8 L. R. A. 511, 22 Am. St. Rep. 531; *Jones* v. *Jones*, 213 Ill. 228, 72 N. E. 695; *Jolly* v. *Graham*, 222 Ill. 550, 78 N. E. 919, 113 Am. St. Rep. 435. Such conveyances are binding upon him and all parties in privity with him. A court of equity will not lend its aid to relieve a party from the consequences of his fraud, but will leave him where his fraudulent undertaking has placed him.

It is well-settled law of this state and of most other jurisdictions, that a resulting trust cannot arise when the transactions on which it is founded appear to have their origin in any fraudulent purpose. The Supreme Court of Missouri, in an early case, *Hendersen* v. *Hendersen's Ex'rs*, 13 Mo. 108, citing *Belden* v. *Seymour*, 8 Conn. 304, 312, 21 Am. Dec. 661, said:

"The purpose really aimed at in this case was to show a resulting trust in the grantor and thereby defeat the action entirely. This is a privilege which strangers, whose interests are affected by the deed, are allowed, but, between parties and privies, such testimony is inadmissible. Parties and privies are not permitted to allege their own fraud as ground for varying or avoiding a deed."

Was then the act of Anthon Olsen, in taking the title to the property in the name of Emma C. Olsen to avoid the reduction in the grazing preference, such a fraudulent or unfair act as to bar him from asserting his claim of title? His act was not in violation of the specific terms of any statute, but it is urged by appellants to have been against public policy. That this may be understood by one not familiar with the policy and regulations for the use of the National Forest, we briefly refer to them. The regulatory control of the use of the National Forest is by act of congress vested in the Department of Agriculture and is administered by the Chief Forester and his aides. Regulations have been set up governing the grazing of live stock on, and other uses of, the National Forests. As far as pertinent to the matter here in-

volved, those regulations are known as regulations G-6, G-7, G-8, and G-9 of the "Rules and Regulations of the Forest Service," published in 1918, 1919, 1920, and 1921, as the "Use Book." The regulations were authorized and expressly provide that they are proclaimed and established, "For the purpose of contributing to the stability of the livestock industry, and making forage resources of the National Forests of the greatest value," and "to secure an equitable distribution of grazing privileges, and the prevention of monopoly." It is provided that no one may graze live stock upon the National Forests except under a permit from the Forest Service, issued annually, but with a preferential right from year to year in the permittee to receive a renewal of his permit, and which runs on year after year until canceled or revoked. To secure such preference, or to be a regular permittee, one must be the legal owner of the live stock to be grazed; must own or have investments in improved farm lands, or commensurate ranch property, adjoining or in the allotted territory to be served by the grazing area, and used in connection with the permitted stock. Such grazing preferences are not severable from the live stock and real estate used in connection therewith, so as to be sold in the usual order of business, but upon sale of the permitted live stock or the real property used in connection therewith, the grazing preference may be waived by the permittee, and a renewal thereof will thereupon be issued to the purchaser, subject only to limitations and qualifications fixed in the rules. To prevent monopoly and secure the greatest use and proper distribution of grazing opportunities and stabilize the livestock industry, the forester may and has established certain limitations in the number of live stock for any grazing area. The "maximum limit" is the number of stock above which an increase in preference may be refused. It signifies the number above which no permittee should be permitted to use the grazing area unless the needs of all grazers below that limit have been supplied. It applies with equal force and effect to preferences covering live stock purchased.

The public policy of the government is thus declared. It seeks to prevent large grazing preferences; to keep them small and within defined limits; provides for reduction of preferences on sale or transfer of property or stock; provides that reductions for range purposes, etc., must come first on those above the fixed maximum limit, and then those above the protective limit, and fixes a minimum or exemption limit below which reductions will not be made except as a final resort for range protection. This grazing preference thus given to the existing user is declared to be a thing of value, affecting the value of the live stock and the real estate used in connection therewith. Permits are only issued to actual legal owners of livestock, and when sales are made and preferences waived, reductions in number are mandatory if it brings the purchaser above the proper limit.

In the case at bar, the court found that Anthon Olsen, seeking to avoid and nullify as to him, this policy, took the title to the property in the name of another, in effect to deceive and mislead the forest officials and thereby avoid a reduction in the number of permitted sheep, and acquire unto himself an untoward and improper advantage and a thing of value. Could he, having thus practiced a concealment and misled the forest officials for his own gain and to acquire that which he could not have acquired—had the facts been known, had the truth been told—now use his own fraudulent act and violation of the rules to have a court of equity restore to him the property he, for fraudulent purposes, vested in another? A learned author states the general rule governing this subject very comprehensively by saying:

"If voluntary conveyance is made for some illegal or fraudulent purpose, whether it is a common law or a modern conveyance, no trust will result to the grantor; as if the voluntary conveyance is made to hinder, delay, or defeat creditors, or to give a man a colorable qualification to vote, or to sit in parliament, or to kill game, or to disqualify the grantor for an office, or to commit any other fraud; for the reason that the rules of law cannot be used, controlled or avoided by

parties with a fraudulent intent to do that indirectly which they cannot do directly." Perry on Trusts (6th Ed.) § 165.

The case of *Murphy* v. *Johnson* (Tex. Civ. App.) 54 S. W. (2d) 158, involves this same principle. See, also, *Daughty* v. *Hall*, 59 Tex. 518; *Robinson* v. *Jones*, 31 Neb. 20, 47 N. W. 480; *Rogers* v. *Blackshear*, 60 Tex. Civ. App. 576, 128 S. W. 938. So all the decisions run, that "no resulting trust could be raised through an act forbidden by law," and that "to raise such trust the transaction must be honest." *Murphy* v. *Hubert*, 16 Pa. (4 Harris) 50; *Anderson* v. *Carkins*, 135 U. S. 483, 10 S. Ct. 905, 34 L. Ed. 272; *Caines* v. *Sawyer*, 248 Mass. 368, 143 N. E. 326; *Doane* v. *Doane*, 238 Mass. 106, 130 N. E. 484; *Verne* v. *Shute*, 232 Mass. 397, 122 N. E. 315.

It is clear, therefore, that Anthon Olsen could not claim or recover this property against the plaintiffs. Can the bank do so? Is it in any better position than its grantor? The bank was not an innocent purchaser. It took with notice. The record title was in the name of Emma C. Olsen or her children, among whom were plaintiffs; the findings of fact show that when Olsen mortgaged the property to the bank, he said the property was in the name of his children; Willardsen, the vice president, and Rasmuson, the cashier, were Olsen's bondsmen both in the probate of the wife's estate and the guardianship proceedings; and the agreement for the sale of the land which brought on this lawsuit and is set out in the findings and is signed by the bank, recites that the lands belongs to the estate of Olsen's former wife, and the bid submitted was for the property of the children.

Clearly, the bank, if not chargeable with actual notice, was put upon inquiry. It is not an innocent purchaser; it stands in privity with Anthon Olsen and can claim no more than he could claim against these children. The first question must therefore be answered in the negative; neither Olsen nor those in privity with him can question or dispute

the deed to, and title of, these minor children in and to the property involved in this action.

This holding disposes of most matters in dispute, but in view of the position taken by the individual defendants, we shall briefly note the other questions presented.

(2) Having answered the first question in the negative, this question would be moot except that it has some relationship to question numbered (6). Do the probate and guardianship proceedings bar the assertion by Olsen or the bank and its officers from asserting any equitable rights in the property? After the death of Emma C. Olsen, ■ Anthon Olsen caused her estate to be probated. He filed his petition under oath stating that the property belonged to her; he caused it to be appraised and inventoried as her property; he deeded his one-third interest in her estate to his children; he, under oath, told the court it was theirs and the court distributed it to them. In the guardianship proceeding commenced in 1931, he, under oath, petitioned the court for guardianship, saying the property belonged to the children, having come to them in 1920 by inheritance from their mother and by gift from him; he inventoried it as the children's property, advertised it for sale as their property, and accepted bids for it as the property of the children. And a more serious matter, even before his appointment as guardian, he entered into a contract with the bank and one G. A. Hansen to sell the property and deprive the children thereof. The bank then knew; Rasmuson and Willardsen, its officers and individual defendants, knew when they made that contract that the guardianship proceedings which they agreed should be instituted were to be had, almost as a farce, not to protect the interests of the minors, but to get from them under the forms of law the property of their estate for the personal advantage of Olsen and the bank. Can they be heard now, under such a record, to assert rights in the property? Clearly, Olsen could not, for time and again in most solemn proceedings and under oath he had reiterated that the property belonged

to the children and by his solemn oaths had the court so decree.

Any equitable right Olsen may have had was clearly waived. And the bank is in no better position than its grantor. In September, 1931, before the guardianship proceedings were had, Olsen, Hansen, and the bank, by Rasmuson, its cashier, made a written contract for the sale of the children's property to pay Olsen's debt to the bank, and agreed to put through guardianship proceedings to carry out this contract. (Finding of fact No. 9.) Such a contract to sell the property of a minor, entered into before court leave had and obtained, is against public policy and void. When coupled with an agreement which calls for despoiling the estate of the minors for the benefit of the contracting parties, it is fraudulent, illegal, and void. Anthon Olsen and the bank, parties participant in such contract, were equally in the wrong. They were in pari delicto to do a wrong, to accomplish an action against public policy and despoil the estate of a minor through the forms of law.

Was such a contract void as against public policy? It is elemental that a guardian may not legally agree to sell the property of his ward without first obtaining the consent of the proper court, and a contract so to do is void. In the contract set forth in the findings, the defendants and Olsen agree to sell the property to a certain party for an agreed price and to secure the appointment of a guardian, and in some manner get the consent of the probate court to the specific contract of sale already made. Such an agreement if made by a guardian already appointed would certainly be void as against public policy. *Miles* v. *Diven,* 6 Watts (Pa.) 148, 150; *Norton & Bridges* v. *Fleming,* 145 Ga. 475, 89 S. E. 573; *Myers* v. *Hodges,* 2 Watts (Pa.) 381, 27 Am. Dec. 319. Nor do we see where it could help the matter that Olsen was not at the time a duly appointed guardian when the parties had agreed in advance that he should be appointed to commit a fraud against the estate of minor children for the benefit of both of them. Discussing the question, in *Brown*

v. *Peterson*, 27 Ariz. 418, 233 P. 895, 896, the Supreme Court of that state says:

"It is plain, therefore, that the issues presented to us are almost entirely matters of law, the vital questions being, first, whether or not the contract and bond referred to are void as against public policy; and second, if so, are the parties in pari delicto. The evidence shows beyond doubt that, in 1917, defendant, with intent to evade the laws of the United States, caused the legal title to the land to be placed in his daughter, Cecelia Peterson. There can be no question that, under such circumstances, there is no resulting trust in favor of defendant, but that the legal title being in the child through the voluntary act of the parent, with the purpose on the part of the latter by so placing it to evade the law, a court of equity will not assist him in establishing any right, either legal or equitable, to such land when the true facts are brought before it. *Sell* v. *West*, 125 Mo. 621, 28 S. W. 969, 46 Am. St. Rep. 508; *Detwiler* v. *Detwiler*, 30 Neb. 338, 46 N. W. 624; 1 Perry on Trusts (4th Ed.) par. 163.

"Plaintiff, however, had nothing to do with this transaction, but we must assume the trial court found he knew the legal title was in the minor's name at the time of the execution of the contract and of the bond. Knowing this, he entered into the agreement to purchase and took a bond, the condition of which was that a guardian should be appointed, and, necessarily acting through such guardian, the probate court should be induced to carry out the contract."

(3) Answering this question, the record clearly shows that the father did not present an account which would justify a holding that he was entitled to a net credit against plaintiffs of $932 or any other amount, except perhaps the income from the property from 1926 to 1931. ■ In finding No. 11, the court found that from 1919 to 1926, Olsen's personal income was sufficient to maintain his family without resort to the children's property (and such was his duty if he could do so) ; that from 1926 to 1931, it was necessary to use all his income and the income from the children's property to properly maintain the family. There is no further finding and no basis for any taking or using of the principal of the children's estate.

What we have said in the foregoing discussion, effectually disposes of the remaining questions. It follows, therefore,

that the conclusions of law and judgment are contrary to the findings of fact.

The judgment is set aside and the cause remanded to the district court of Sanpete county with directions to enter conclusions of law and judgment in accordance herewith, in favor of the plaintiffs and against defendants for the sum of $932 with interest thereon from June 4, 1932. Appellants to recover costs.

FOLLAND, C. J., and HANSON and MOFFAT, JJ., concur.

WOLFE, Justice.

I concur in the results and in the reasoning, except that I am not prepared at this time to say that the contract made between the bank and Anthon Olsen that the latter should apply for leave to sell the minors' property and apply the proceeds to the bank's indebtedness was void because against public policy. A contract may be void because prohibited by statute or because a necessary condition precedent has not been fulfilled and yet I opine not against public policy unless everything prohibited may be said to be against public policy on the theory that a prohibition expresses by inference that it is public policy not to do the prohibited act. But I hardly believe it could be said to be against public policy to park a car overtime. Public policy, I think, furnishes a guide for the conduct of those subject to sovereignty, action contrary to which is considered injurious to the public good in its larger aspects as affecting the public. It is reflected by its laws, general considerations of public welfare, morality, and ethics, and may or may not be pronounced by a single affirmation or prohibition.

I am not at this time prepared to say that the contract entered into between the bank and Olsen was against public policy and therefore void. I am prepared to say that it was illegal, that is, against law, and that the bank cannot obtain any of its fruits. I am sure that we should be very careful how we use the words "void," "public policy," "jurisdiction,"

and the like. While I am not prepared to disagree with that part of the opinion, the result not depending upon it, I choose to reserve judgment in regard thereto. No one can agree to give away another's property for his own benefit without the consent of the other. And any person who knows that he is getting his debt paid from the unauthorized application of another's property or makes a contract with him to aid him in taking steps to accomplish that purpose is doing an illegal act, and may be making a void contract and may be doing something against public policy. But it is enough, at least for this case, that he is doing an illegal act.

I am not so sure that the evidence contains sufficient to infer that the bank consciously knew it was doing a wrong thing in making this contract. True, its officials apparently knew that when the sheep were purchased from Stevens by Anthon Olsen, they were conveyed to Mrs. Olsen to circumvent the forestry regulations because it advanced the money to Mr. Olsen and took a mortgage on the sheep, but the bank may have honestly thought the father all the while owned the equitable interest and that it was simply concurring in going through the forms in order to obtain the father's property to pay his indebtedness. But the results must nevertheless be as worked out in the opinion. Therefore, I concur.