[L. A. No. 2030.   Department One.—July 1, 1908.]

## G. E. ALDERSON et al., Appellants, v. H. R. HOUSTON, Respondent.

REAL ESTATE AGENTS—CONTRACT AUTHORIZING SALES—CERTIFICATES OF CLEAR TITLE—STREET-ASSESSMENT LIENS—TAXES.—Under a contract authorizing real estate agents to sell certain lots, and obligating the principal to furnish certificates of title that will show the lots to be clear of encumbrances, except building restrictions, "and such taxes that may be assessed but are not due and payable," the principal was bound to furnish a certificate of title to the lots showing the same to be free from all liens except such state, county, and city taxes as were assessed but not due or payable, and to clear the property from all street assessments and to furnish certificates accordingly.

ID.—MEANING OF WORD "TAX"—ORDINARILY DOES NOT INCLUDE STREET ASSESSMENTS.—While in the broad sense of the term the word "tax" may be construed to include special assessments made to pay for improvements upon streets or for the opening thereof, yet such is not the ordinary and usual meaning of the word. In the ordinary course of business, particularly among real estate dealers, that word is used to refer to ordinary taxes assessed upon property for state, county, or city purposes, and not to designate street assessments for public improvements.

ID.—OBLIGATION OF PRINCIPAL TO REMOVE STREET-ASSESSMENT LIENS— ESTOPPEL AFTER LIEN HAS MERGED IN BOND.—Where the principal had the opportunity, under the Bond Act (Stats. 1893, p. 33; 1899, p. 40), to discharge the assessment before the ten-year bonds had been issued therefor, and neglected so to do, he is estopped to set up his inability to discharge the liens for the bonds subsequently issued, as an excuse for non-performance of the contract on his part.

ID.—ENTIRE CONTRACT TO SELL LOTS.—A contract authorizing and employing real estate agents to make sale within a time limited of

CLIV Cal.—1

forty-three lots at a separate price for each lot, for an aggregate specified commission, must be considered as an entire contract, whereby its terms the agents are not entitled to anything except to a much smaller amount for advance commissions and discounts until the entire contract is performed, and there is no scale furnished by the contract whereby the whole amount they are entitled to for each lot can be apportioned.

ID.—BREACH OF CONTRACT BY PRINCIPAL — DISCHARGE OF AGENTS — ACTION FOR BREACH.—Where the principal to such contract is under obligation, as sales of separate lots are made by the agents, to clear such lots from all street assessments and to furnish certificates of title accordingly, and he repudiates such obligation and disables himself from performance by suffering the accrual of bond liens for street assessments as to certain lots sold which could not be removed except with the consent of the bondholder, thus preventing the agents from performing their part of the contract, such conduct amounts to the breach of a condition precedent to the performance by the agents and a wrongful discharge of the agents, and the contract being entire, the agents were entitled to sue upon the breach immediately and recover the entire damage resulting from it, without waiting for the time for full performance to lapse, and were not required to go on making sales of other lots and demanding certificates showing clear title.

ID.—MEASURE OF DAMAGES—EVIDENCE IN MITIGATION.—If the agents elect to sue at once for such branch of the contract, they are entitled to recover the amount of compensation, if any, earned by them prior to the breach and remaining unpaid, and, in addition to this, the probable damages sustained by them by reason of the breach. Such damages are *prima facie* the whole amount of unearned compensation which they would have earned if allowed to carry out the contract; but the principal may reduce such amount of damages by showing affirmatively, the burden of proof being on him, that the agents will probably find similar employment during the remainder of the term fixed by the contract.

ID.—CONDITIONAL WITHDRAWAL OF REPUDIATION BY PRINCIPAL.—Where the time of performance by the agents was limited by the contract to eighteen months from its date, during more than four months of which the principal persisted in so repudiating his obligation, with the result of preventing the completion of sales as to several of the lots, the subsequent offer of the principal to extend the life of the contract for a further period of four months, coupled with the assertion that he would not be bound to clear the title of street assessments but would do so or not at his pleasure, did not operate to remove the effect of his repudiation of his obligation under the contract.

ID.—MEASURE OF DAMAGES—PROBABILITY OF PERFORMANCE BY AGENT.— Under section 3300 of the Civil Code, the measure of damages for the breach of such contract by the principal is the amount which

will compensate the agents for all detriment proximately caused thereby, or which in the ordinary course of things would be likely to result therefrom. The question whether or not the contract could have been performed by the agents, so as to entitle them to the full compensation provided for therein, was one of fact to be determined from the evidence, and in its determination the jury may proceed upon reasonable probabilities, and accept as sufficiently proved those results which, under like circumstances, generally come to pass.

ID.—AGENTS' EXPENSES IN MITIGATION.—In mitigation of damages, the principal is entitled to deduct from the contract price the amount which the agents would have had to expend in the future performance of the contract, and which they were excused from expending by reason of the principal's breach and their election to treat the contract as terminated.

APPEAL from a judgment of the superior court of Los Angeles County and from an order refusing a new trial. Charles Monroe, Judge.

The facts are stated in the opinion of the court.

Charles L. Batcheller, and Thos. C. Ridgway, for Appellants.

Russ Avery, and Samuel H. French, for Respondent.

SHAW, J.—The plaintiffs appeal from a judgment and from an order denying their motion for a new trial.

The complaint states a cause of action for the breach of a contract on the part of defendant, as owner of forty-three lots in the city of Los Angeles, empowering the plaintiffs as real estate brokers to sell the said lots.

The contract is dated May 17, 1904. It declares that the defendant is the owner of forty-three lots, describing them, and gives to plaintiffs the right to the exclusive sale thereof for the period of eighteen months from its date. It contained the following provision:

"All sales are to be made with delivery of certificates of title for each lot as sold or passes title under the terms of this agreement, drawn by the Title Insurance & Trust Co. of Los Angeles, and shall show clear of encumbrances, except building restriction, and such taxes that may be assessed but are not due and payable."

It further provided that an advance commission of ten per cent on the selling price should be paid to plaintiffs, and that "a commission of eight thousand dollars, less such amounts as are paid in cash as advance commission, being the said ten per cent, and such discounts as shall have been allowed from list prices to said Alderson shall be paid in cash when all the said lots are sold."

The discount mentioned referred to certain discounts to be allowed on sales of certain lots upon which plaintiffs were to build houses. It was agreed that they should erect on the lots six houses within twelve months and four within fifteen months from the date of the contract. Time was made of the essence of the agreement and it was agreed that any failure of the parties thereto to comply with the terms thereof should forfeit the contract upon thirty days' written notice. The sales of the respective lots were to be made at prices stated in a schedule attached to the contract. It is alleged that the plaintiffs proceeded to place the lots on the market for sale, advertise them in the newspapers, place sign boards advertising that the same were for sale by plaintiffs, and in all the usual ways, and in various ways, endeavored to procure purchasers, built houses on several of the lots in pursuance of the terms of the agreement and made sales of a number of the lots at the prices agreed upon, for which they received advance commissions and discounts amounting to two thousand three hundred and twenty dollars. It is further alleged that certain street assessments for the improving and opening of streets abutting on the lots became a lien upon a number of the lots, that the plaintiffs procured purchasers for some of these lots ready, able, and willing to buy the same, and demanded of defendant that he procure a certificate of title showing the same to be free from encumbrances; that thereupon the defendant refused to remove the liens of said assessments from said lots, and refused to furnish the certificates of title as demanded and denied his obligation under the terms of the contract to clear any lots of the lien of said assessments, whereby the said sales so made by the plaintiffs were prevented and defeated and the plaintiffs were prevented from performing their part of the contract. It is claimed that, by reason of the conduct of the defendant in preventing the performance of the contract by plaintiffs, the plaintiffs are entitled to recover the

damages arising from the breach of the contract, and that this consists of the eight thousand dollars agreed to be paid as commissions upon the sale of all the lots, less the sums received in advance as the contract provides, which balance amounts to five thousand six hundred and eighty dollars.

The court found that the plaintiffs placed the lots on the market, advertised them and made the effort to sell the same as alleged in the complaint, and that they procured purchasers for twelve of the lots not encumbered by assessment-liens, for which certificates of title were furnished and deeds made to the satisfaction of the purchasers, and upon which the two thousand three hundred and twenty dollars advance commissions and discounts were received by the plaintiffs. The dispute arises concerning lots 13, 16, 54, 55, and 56. As to lots 54 and 55 the court finds that the plaintiffs found purchasers therefor and that defendant hindered and prevented the sales thereof, but that after February 23, 1905, he did not refuse to clear the title of said lots of the assessment-lien, or refuse to furnish the certificate of title provided in the contract, nor insist that the purchasers should pay the assessment or accept title to the lots subject thereto. As to lot 56 the finding is to the same effect, except that it is found that the defendant did not hinder or prevent the sale thereof. As to lots 13 and 16 the court finds that the plaintiffs found purchasers therefor, but that the defendant did not refuse to furnish clear certificates nor hinder or prevent the sales. The plaintiffs found purchasers for lots 54 and 55 at the agreed price of one thousand one hundred dollars each. Under the terms of the contract there was a discount of twenty-five per cent upon the price of lot 55, to which the plaintiffs would have been entitled, as part of the commission, if they had made the sale. They would also have been entitled to one hundred and ten dollars, as ten per cent advance commission on the sale of lot 54, if such sale had been accomplished, making a total of three hundred and eighty-five dollars on the two lots.

The plaintiffs claim that the judgment in favor of the defendant is not supported by the findings and that many of the findings are not supported by the evidence.

The evidence shows that at the time the contract was made the assessment-liens on lots 54, 55, and 56 had not accrued and

that they did not accrue until September 16, 1904. Sales of lots 54, 55, and 56 were made about October 7, 1904. Houston made deeds ready for delivery for lots 54 and 56, conveying title subject to the assessment-liens. He was requested on October 20, 1904, to discharge the liens and furnish clear certificates of title, whereupon he refused to furnish the same or to make a deed except upon the condition that the purchasers should pay or assume the liens, stating that the contract did not require him to give title to any of the lots free or clear of assessment-liens. The court found that his contention in this respect was untenable and in this we think the court was correct. The part of the contract above quoted required him to furnish a certificate of title showing the property clear of encumbrances, except building restrictions and taxes assessed but not due and payable. While in the broad sense of the term the word "tax" may be construed to include special assessments made to pay for improvements upon streets or for the opening thereof, yet such is not the ordinary and usual meaning of the word. In construing contracts the words thereof are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning. (Civ. Code, sec. 1644.) In the ordinary course of business, particularly among real estate dealers, it is well known that the word "taxes" is used to refer to ordinary taxes assessed upon property for state, county, or city purposes, and not to designate street assessments for public improvements. There is nothing to indicate that it was here used in other than its ordinary meaning. By the contract, therefore, the defendant was bound to furnish a certificate of title for each lot showing that the same was free from all liens except such state, county, and city taxes as were assessed but not due or payable. He was, consequently, bound to clear the property from all street assessments and to furnish certificates accordingly.

In this connection another contention of defendant may be considered. The proceeding for improving the street in question was made under the general street improvement law and the so-called Bond Act. (See General Laws, Pony ed. 1906, pp. 1279, 1330; Stats. 1885, p. 147, and amendment thereto; Bond Act, Stats. 1893, p. 33; Stats. 1899, p. 40.) At the trial Houston claimed that ten-year bonds had been issued on these assessments which were not due and payable except in annual

installments, and hence that they came within the exception in the contract as taxes "not due and payable." The assessment became a lien on September 16, 1904, the date of issuing and recording the warrant. (Sec. 10, Street Improvement Act, *supra.*) Bonds could not in any event be issued therefor until the expiration of thirty days thereafter and after the recording of the contractor's return to the warrant. (Sec. 4, Bond Act, *supra.*) In the intervening time the entire assessment on each lot was due and payable. (Sec. 10, *supra.*) It was therefore optional with Houston either to pay the assessments, or, by non-payment, to suffer the issuance of ten-year bonds therefor. He had, by his contract with plaintiffs, agreed to sell these lots free from such liens, at any time within eighteen months from the date of the contract. His conduct in thus voluntarily permitting them to become encumbered by liens for these bonds which could not be discharged for ten years, was an act by which he disabled himself from executing his contract according to its terms. The assessments having become due and payable after his contract was made, and he having then had an opportunity to discharge the liens, he would be estopped to set up his inability to discharge the liens for the bonds subsequently issued, as an excuse for non-performance of the contract on his part.

After his refusal of October 20th to pay the liens, or furnish clear certificates therefor, a correspondence on the subject ensued between plaintiffs and defendant. The plaintiffs steadily insisted that Houston was bound to furnish clear certificates and remove the liens, declared that the sales made would fall through if their demands were not promptly met, and urged immediate action. They also stated that it was useless to try to sell the lots at the schedule prices with the assessment-liens upon them and that in order to enable them to carry out their contract they must have the question settled. The defendant steadily persisted in his refusal and in his denial of any obligation to pay the liens or furnish certificates clear of such liens. During this correspondence and because of the delay in clearing the title, the buyer of lot 54 withdrew his offer and claimed and obtained a return of his deposit. A certificate of title was ordered for lot 55, but further proceedings upon that sale were delayed by the plaintiffs because of the existing controversy concerning the assessment-

liens, they having informed the buyer that the sale was to be made free of encumbrance. The buyer, after some delay, refused to wait longer for the title to be cleared and withdrew his deposit and offer. Houston was not informed of this sale nor specifically requested to clear the title thereto.

A formal demand for a clear deed and certificate for lot 56 was made on January 20, 1905, and was definitely refused by the defendant on January 24, 1905. On February 23, 1905, the defendant served on plaintiffs a written notice stating that he had executed and deposited in escrow a deed of lot 56, clear of liens, and that he would thereafter, until he should give written notice to the contrary, execute deeds and procure certificates of title clear of encumbrance, for all lots sold by the plaintiffs under the contract, but that he contended and would continue to contend, until he gave written notice otherwise, that he was not bound by the contract to give deeds or procure certificates free from the lien of street assessments, and that he reserved all his rights under the contract, that he did this in order to remove any excuse claimed by plaintiffs for not performing the contract on their part, and to protect himself in case his construction of the contract was finally determined to be wrong, and not as a compromise or with any concession that his construction of the contract was not correct. The deed referred to in this notice did not on its face purport to convey a clear title, but declared that it was made "subject to all taxes and assessments levied or assessed against the property after the 17th day of May, 1904," which made it subject to the street bond thereon amounting to $483.40. He had, however, deposited with the deed his check to the city treasurer for the amount of the bond, with instructions to the escrow holder to deliver the check to the city treasurer when the deed was taken up. The holder of the bond had agreed to accept full payment in that way and cancel the bond, but plaintiffs were not informed of that fact until the trial of the cause. The plaintiffs did not accept the propositions made in the notice of February 23d, but replied thereto on March 2, 1905, saying that it came too late, that they had been prevented from making sales by his delay and refusal to conform to the contract, and that unless he would give a reasonable extension of time for the performance of the contract by them and would agree thereafter to pay or remove all street

assessment-liens as the lots were sold, they would insist on their rights and damages for his breach of the contract. To this Houston replied on March 4th and 15th, in writing, reaffirming all that he said in his notice of February 23d and stating that, while no legal or moral reason existed for so doing, yet he would and did extend the time limit of the contract four additional months, but that he would not agree to abide by the contract, except as stated in said notice. This offer to extend the time was not accepted on the terms proposed, and on May 8, 1905, it was withdrawn. The plaintiffs did not take up the deed for lot 56 in pursuance of the offer of February 23d, and about the first of June, 1905, they began the present action.

Although the contract in question provides for the sale of forty-three lots at a separate price for each lot, yet in view of its provisions with respect to the payment of the eight thousand dollars commissions it must be considered as an entire contract. The total price of all the lots according to the schedule prices was forty-seven thousand two hundred and seventy-five dollars. The eight thousand dollars commissions provided for was evidently not calculated upon any percentage of the prices fixed. By the terms of the contract if plaintiffs failed to make a sale of all the lots they would receive nothing excepting the advance commissions and discounts, which would not amount to eight thousand dollars. It is similar in this respect to the contract considered in *Cox* v. *Western Pac. R. R. Co.*, 44 Cal. 18. There a contractor agreed to grade and construct a section of a railroad at a fixed sum for the entire work, to be paid from time to time in installments as the work progressed, and it was held that the contract was entire and that the provision for payments from time to time as the work progressed did not make it severable. In the present case the plaintiffs are not entitled to anything except the advance commissions and discounts until the entire contract is performed, and there is no scale furnished by the contract whereby the whole amount they are entitled to for each lot can be apportioned. See, also, the following authorities: *Sterling* v. *Gregory,* 149 Cal. 117, [85 Pac. 305]; *Potter* v. *Potter,* 43 Or. 154, [72 Pac. 704]; *Horseman* v. *Horseman,* 43 Or. 94, [72 Pac. 698]; 2 Parsons on Contracts, 519; 3 Page on Contract, secs. 1484, 1487, 1493.

The contract made plaintiffs agents of defendant to sell all the lots for the agreed commission, at the agreed price, upon the terms fixed thereby and within the time limited. The conduct of the defendant in repudiating his own obligation to perform, in refusing to perform a material part of the contract, and in disabling himself from performance by suffering the accrual of bond liens which could not be removed except with the consent of the bondholders, prevented the plaintiffs from performing their part of the contract as its terms provided. It amounted to a wrongful discharge of plaintiffs as agents. It was a breach of a material part of an entire contract; "the first breach by the defendant was a breach of the whole and discharged the plaintiffs from performance of any conditions on his part." (*Haskell* v. *McHenry*, 4 Cal. 411.) "Plaintiffs were entitled to sue upon the breach immediately, and recover the entire damage resulting from it, without waiting for the time for full performance to elapse." (*Hale* v. *Trout*, 35 Cal. 242.) They were not required to go on making sales and demanding certificates showing clear title. The law is well and succinctly stated in Clark & Skyles on Agency, sec. 365, p. 826, as follows:—

"The agent has the election of two remedies by which he may obtain the redress for the wrongful discharge: (1) He may treat the contract as rescinded and sue at once, on a *quantum meruit* for the service actually rendered by him prior to the revocation and notice thereof; or (2) he may treat the contract of employment as continuing, though broken by the principal, and sue on the breach, for damages. In the latter case he may either sue, for damages, at once upon the breach of the contract, or wait until the expiration of the time of service fixed by the contract and then sue for damages." . . . (p. 828) "If he elects to treat the contract as continuing and sues at once for the breach, he is entitled to recover the amount of compensation, if any, earned by him prior to the breach, and remaining unpaid, and, in addition to this, the probable damages sustained by him by reason of the breach. Such damages are *prima facie* the whole amount of unearned compensation which he would have earned if allowed to carry out the contract; but the principal may reduce such amount of damage by showing affirmatively, the burden of proof being on him, that the agent will probably find similar employment

during the remainder of the term fixed by the contract." . . .
(p. 830) "When an agent has notice of his wrongful dis-
charge, it is not necessary that he should tender his service or
keep himself in readiness to perform. . . . All that is neces-
sary is that he was ready and willing to continue in such em-
ployment at the time of the discharge."

It is claimed on behalf of the defendant that the conduct of
the defendant, although contrary to the terms of the contract,
did not constitute a sufficient prevention of performance by
plaintiffs to justify them in declaring the contract terminated
and suing to recover the entire compensation allowed therein.
We think this claim cannot be sustained. The question was
elaborately discussed in *Lake Shore etc. Ry. Co.* v. *Richards,*
152 Ill. 59, [33 N. E. 773]. After quoting from the decision
in *Palm* v. *Ohio etc. Ry. Co.,* 18 Ill. 217, the following passage:
"I have examined all the authorities referred to by counsel,
and have made diligent search myself, but have found no case
where the plaintiff has been allowed to recover for losses sus-
tained by not being permitted to complete the contract, unless
he has been prevented from going on with his work by the
positive affirmative act of the other party, or where the other
party has neglected to do some act without which the plaintiff
could not, in the nature of things, go·on with his contract";
the court proceeds to discuss the question, and in the course
of the discussion says: "Stress is laid by counsel upon the
words 'prevented from going on.' . . . The same language—
i. e., that the party suing must be 'prevented' from perform-
ance, has been used in numerous cases, but wherever the atten-
tion of the court has been directly called to the sense in which
the word has been used, it has been held not to mean that there
must be physical prevention, but that any acts, conduct or
declarations of the party evincing a clear intention to repu-
diate the contract and to treat it as no longer binding are a
legal prevention of performance." After some further discus-
sion the opinion proceeds: "Without further quotation from
cases, it seems clear, both upon principle and by authority,
that where one party to an executory contract refuses to treat
it as subsisting and binding upon him, or by his acts and con-
duct shows that he has renounced it and no longer considers
himself bound by it, there is, in legal effect, a prevention of
performance by the other party, and it can make no difference

whether the contract has been partially performed or the time
for performance has not yet arrived; nor is it important
whether the renunciation be by declaration of the parties that
he will be no longer bound, or by acts and conduct which
clearly evince that that determination has been reached and is
being acted upon. It would seem clear, on principle, that a
mere declaration of the party of an intention not to be bound,
or acts and conduct in repudiation of the contract, will not, of
themselves, amount to a breach, so as to create an *effectual*
renunciation of the contract, for one party cannot, by any act
or declaration, destroy the binding force and efficacy of the
contract. (Italics are ours.) As said by Bowen, L. J., in
*Johnson* v. *Milling Co.*, 16 Q. B. Div. 460 : 'Its real operation
appears to be to give the promisee the right of electing either
to treat the declaration as *brutum fulmen*, and holding fast to
the contract to wait till the time for its performance has ar-
rived, or to act upon it, and treat it as a final assertion by the
promisor that he is no longer bound by the contract, and a
wrongful renunciation of the contractual relation into which
he has entered. . . . If he does so elect, it becomes a breach
of contract, and he can recover upon it as such.' Upon the
election to treat the renunciation, whether by declaration or
by acts and conduct, as a breach of the contract, the rights
of the parties are to be regarded as then culminating, and the
contractual relation ceases to exist, except for the purpose of
maintaining the action for the recovery of damages. These
views are amply sustained by numerous decided cases." The
court cites and discusses the following cases supporting the
proposition : *Hochster* v. *De Latour*, 20 L. and Eq. 157 ; *Frost*
v. *Knight*, (L. R.) 7 Exch. 111; *Freeth* v. *Burr*, (L. R.) 9 C.
P. 208 ; *Mersey S. and I. Co.* v. *Naylor*, 9 Q. B. Div. 648 ; *Roper*
v. *Johnston*, (L. R.) 8 C. P. 167 ; *Ex parte Stapleton*, (L. R.)
10 Ch. Div. 586 ; *Planche* v. *Colburn*, 8 Bing. 14; *Danube and
B. S. R. Co.* v. *Xenos*, 13 C. B. (N. S.) 825 ; *Masterson* v.
*Mayor*, 7 Hill, 61, [42 Am. Dec. 38] ; *Hosmer* v. *Wilson*, 7
Mich. 304, [74 Am. Dec. 716] ; *Derby* v. *Johnson*, 21 Vt. 21;
*Hinckley* v. *Pittsburgh S. Co.*, 121 U. S. 264, [7 Sup. Ct. 875] ;
*Haines* v. *Tucker*, 50 N. H. 307 ; *Smith* v. *Lewis*, 24 Conn. 624,
[63 Am. Dec. 180].

The same principle is stated in *De Prosse* v. *Royal Eagle
Co.*, 135 Cal. 411, [67 Pac. 502], where the court says, referring

to a repudiation by the defendant of a part of an entire contract: "A repudiation of a part of it was, as to plaintiffs, a repudiation of it all, that is, plaintiffs had the right to consider the breach of this covenant a breach of the entire contract," quoting with approval the passage from *Haskell* v. *McHenry,* 4 Cal. 411.

The defendant claims that the case falls within the rule stated in *Cox* v. *McLaughlin,* 54 Cal. 608, and *Cox* v. *McLaughlin,* 76 Cal. 60, [9 Am. St. Rep. 164, 18 Pac. 100], where it was held that where a contract was entire, and the consideration for the work to be done by plaintiff was to be paid in installments as the work progressed, the mere failure or refusal of the defendant to pay an installment when it became due did not constitute such a prevention of performance as to authorize the plaintiff to sue for the entire contract price without performing all the work, but that it was a sufficient breach to warrant the plaintiff in treating the contract as rescinded, refusing to go on with the work and suing upon a *quantum meruit* for the value of the work already done. But, as is pointed out in *Porter* v. *Arrowhead R. Co.,* 100 Cal. 500, [35 Pac. 146], those cases were so decided for the reason and upon the ground that the payment of an installment upon the contract price was not a condition precedent to the doing of the work, and that a breach cannot be a "prevention" of performance by the other party, unless it is a breach of a condition precedent, that is, of something which the defendant must do before the plaintiff can perform. In the case at bar we find that the condition broken by Houston, the part of the contract which he repudiated, was a condition precedent to the performance by plaintiffs. The defendant was to furnish certificates showing clear titles to the satisfaction of buyers. The plaintiffs could not complete the sale of any lot upon the contract terms until this was done. It is not for the defendant to say that purchasers might have been found who were willing to take the lots and pay or assume the liens in addition to the contract prices if the plaintiffs had continued to make efforts to that end. The plaintiffs owed him no duty to find such buyers. They had a right to stand upon the contract. The refusal of the defendant to clear the lots of the liens effectually prevented the plaintiffs from completing the making of the sales above mentioned and also from the performance of their part of the contract.

It is further claimed that by the offer contained in the notice of February 23, 1905, and the extension of time offered on March 4th, Houston receded from his refusal and from his repudiation of the contract, and removed all excuse for a lack of full performance by plaintiffs. The claim is not tenable. In the first place, the time of performance was limited by the contract to eighteen months from its date. During more than four months of that time, Houston had repudiated his obligation and had refused to perform the same and this delay had, as the evidence shows, prevented the sales of the four lots numbered 13, 16, 54, and 55. As to lots 54 and 55 the court so finds. As to the other two, the evidence shows that plaintiffs had found purchasers ready, able, and willing to buy at the fixed prices, if the title were cleared, but that because of Houston's repudiation and refusal, they could give no assurance that the title would be cleared and that after waiting a long time, during which the hope was held out to them that Houston would ultimately yield his claim and give a clear title, the buyers became weary and refused to go on with the purchases. The subsequent offer of Houston did not restore to plaintiffs these buyers, nor destroy the effect of his previous refusal to be bound. In the second place, Houston's offer of February 23d was not a retraction of his previous refusal to be bound. On the contrary, he thereby repeated and reaffirmed his intention not to be bound and declared that he would thereafter perform the contract, or not, as he should choose. If plaintiffs had accepted this as a settlement of the dispute, they could no longer give prospective buyers a positive promise of a clear title, or make a positive sale at the fixed prices, but would be compelled to say that both the title and prices were dependent upon the pleasure of Houston and were not fixed by the contract. The proposition of Houston was a clear repudiation of his obligation. The offered extension of time did not remove the objection. It was accompanied by a condition that Houston had no right to impose,—namely, that he was not to be bound to clear the title, but would do so or not at his pleasure. The plaintiffs were not required to accept the offer of extension with that condition annexed. The performance on their part involved the expenditure of money in advertising and of time and effort to find buyers and it would be unjust to require them to do this in reliance upon the mere volition of Houston

instead of upon his obligation to which they had a right. In *Lake Shore etc. Co.* v. *Richards,* there was a similar dispute as to the construction of a contract and a refusal to perform as to a part only. With respect to this the court there said (152 Ill. 199, [38 N. E. 783]): "Under the construction of the contract upon which it had acted and was proposing to continue to act, it was under no obligation to deliver any cars to be transferred by plaintiff's firm, thus absolutely repudiating its contract liability to do so. True, it had not altogether ceased to deliver some cars to be thus transferred, but they were not delivered because of any contract liability to do it, but at their convenience and option." It was held that this did not remove the effect of the repudiation of the obligation.

As the case must be reversed for a new trial, it is proper to discuss the question of the measure of damages. The rule applicable to such breach of contract is stated generally in section 3300 of the Civil Code whereby the damages allowed are said to be "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which in the ordinary course of things would be likely to result therefrom." There are a few cases, involving the future performance of a broken contract, wherein it has been held that the possibility that the plaintiff would have been able to perform if he had not been prevented, was, from the nature of the undertaking, so remote and speculative that the contract price for full performance could not be allowed as damages. Contracts of agency to sell goods in unlimited quantities on commission have been held to be in this class. (*Union R. Co.* v. *Barton,* 77 Ala. 148; *Brigham* v. *Carlisle,* 78 Ala. 248, [56 Am. Rep. 28]; *Washburn* v. *Hubbard,* 6 Lans. 11.) These, however, are exceptions. The general rule is thus stated in 1 Sutherland on Damages, sec. 121: "The decided cases which relate to prospective damages warrant the statement that the injured party is entitled to recover compensation for such elements of damage as are likely to occur; the jury may proceed upon reasonable probabilities, and accept as sufficiently proved those results which, under like circumstances, generally come to pass. It is not, however, to be hence inferred that prospective damages may be recovered on every plausible anticipation, nor that no allowance is to be made for the uncertainties which affect all conclusions depending on future events; it is only intended

that such uncertainties, where the damages are shown by evidence reasonably certain, do not exclude them wholly from consideration." As was stated in *Danforth* v. *Tenn. etc. Co.,* 93 Ala. 614, [11 South. 60], "If profits formed a constituent element of the contract, their loss the natural and proximate result of the breach, and such as was reasonably in the contemplation of the contracting parties, and the amount can be estimated with reasonable certainty, they are recoverable."

There was uncontradicted evidence in the case at bar showing that it was extremely probable that plaintiffs could and would have sold all the lots within the time limited in the contract, if the defendant had been willing to clear the title. It was amply sufficient to support a finding to that effect. The court below made no finding on the point, being evidently of the opinion that no finding was required, inasmuch as it concluded that there had been no prevention of performance. The question whether or not the contract could have been performed was a question of fact to be determined from the evidence, in case the court had concluded that the defendant was liable.

In mitigation of damages the defendant would have been entitled to deduct from the contract price the amount which the plaintiffs would have had to expend in the future performance of the contract and which they were excused from expending by reason of the defendant's breach and their election to treat the contract as terminated. (1 Sutherland on Damages, sec. 120, p. 340; *United States* v. *Speed,* 75 U. S. 84; *Masterton* v. *Mayor etc. of Brooklyn,* 7 Hill 62, [42 Am. Dec. 38] ; *McMasters* v. *State,* 108 N. Y. 556, [15 N. E. 417].) The defendant did not introduce any evidence in mitigation of damages.

We are of the opinion that the court erred in its conclusions of law, first, that the defendant did not prevent the performance by plaintiffs of the contract; and, second, that plaintiffs were not entitled to the agreed commission less the amounts previously paid thereon, and that the motion for new trial should have been granted.

The judgment and order are reversed.

Angellotti, J., and Sloss, J., concurred.