[Civ. No. 3208.    Third Appellate District.—June 1, 1927.]

THE PEOPLE'S FINANCE AND THRIFT COMPANY (a Corporation), Respondent, v. C. G. SHUMAN, Appellant.

[1] CORPORATIONS—CONTRACT WITH AGENT TO ORGANIZE BRANCH COMPANY—ACTION FOR MONEY HAD AND RECEIVED—CROSS-COMPLAINT FOR DAMAGES—EVIDENCE—FINDINGS.—In an action for money had and received by defendant as agent in the sale of stock for plaintiff corporation, in which defendant cross-complained for damages for breach of contract to give defendant the exclusive right to organize a branch finance company, evidence that defendant sent plaintiff a check for the balance due mistakenly made for a less amount without claiming damages at the time, together with statements and transactions between the parties, justified the finding that defendant's cross-complaint was entirely unfounded.

[2] Id.—Breach of Contract—Conflict of Evidence—Appeal.—In such action, the question whether there was a breach of any contract between plaintiff and defendant as alleged in the cross-complaint was for the trial court's decision, and it was for that court, as the trier of facts, to resolve all conflicts arising in the evidence, and to determine the evidentiary value or probative force of the testimony of witnesses testifying before it by tests not available to a court of review.

[3] Appeal — Evidence — Findings. — Findings of the trial court on questions of fact are conclusive on the appellate court where the evidence is conflicting.

(1) 2 C. J., p. 953, n. 69.    (2) 4 C. J., p. 844, n. 66.    (3) 4 C. J., p. 883, n. 33.

APPEAL from a judgment of the Superior Court of Sonoma County. H. L. Preston, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

W. F. Cowan for Appellant.

Heidelberg & Murasky for Respondent.

HART, J.—The plaintiff, a finance promotion corporation, organized and existing under the laws.of this state, whose principal place of business is in the city of Los Angeles, instituted this action to recover from defendant, as alleged in the first count of the complaint, the sum of $1,165, as for money "had and received," and, as alleged in the second count of the complaint, for the additional sum of $84.30, on account of moneys paid out by plaintiff for defendant at the special instance and request of the latter. The plaintiff prayed for judgment in the total sum of $1,249.38, being the sum of the amounts sued for in both counts of the complaint.

The answer filed by defendant denied the allegation of the complaint, admitting, however, that plaintiff, prior to the commencement of the action, demanded payment from defendant of the sum alleged in the first count to be due it

3. See 2 Cal. Jur. 921; 2 R. C. L. 204.

from the latter and that defendant refused to pay said sum or any sum to plaintiff; alleged that defendant has fully paid and discharged any debt or obligation he ever owed to plaintiff or that ever existed against him in favor of plaintiff, etc.

Defendant also filed a cross-complaint, demanding judgment against plaintiff for damages in the sum of $12,000 for an alleged breach of a contract wherein and whereby plaintiff, so said pleading alleges, agreed to give and did give to defendant the exclusive right to organize and establish for plaintiff, in the city of Eureka, Humboldt County, a branch finance company, and to solicit subscriptions for and sell corporate stock therein, the alleged damages being based and computed upon the probable amount of stock therein which defendant would have sold had he not been prevented by plaintiff from proceeding with the carrying out of the terms of said agreement. It is alleged in the cross-complaint that plaintiff's business is that of "organizing and establishing branches and auxiliary connections in the state of California for the purpose of doing business in buying securities and making loans to customers on securities"; that plaintiff, for the purpose of extending the scope of its operations in that line of activity, appointed and constituted defendant its agent with authority to organize and establish such finance company and, to that end, to solicit and receive subscriptions for 750 shares of stock in such finance company, and agreed to pay the defendant for the services so performed the sum of $16 per share for each share for which the said defendant should obtain a subscription, or which he should sell and that the said "defendant was skilled and experienced in said line of work and thoroughly understood the manner and method of organizing such branch institution and operating and conducting the same and receiving subscriptions for the stock thereof, all of which was well known to plaintiff and in consideration thereof, the said defendant did accept said employment and was ready, able and willing to fully perform and discharge said employment and in order to discharge said employment and organize the said institution in the territory aforesaid did cancel and forego other remunerative employment then offered him and other work at which he could have received

and made a valuable profit, for the purpose of engaging in the work and employment offered by plaintiff and accepted by defendant and the said plaintiff did promise and agree with defendant that they would not employ any other person, or use any other means, either directly or indirectly for the purpose of selling and receiving subscriptions for said corporate stock of said corporation in the territory aforesaid, but notwithstanding, the said plaintiff did, against the wish and consent of defendant enter the said territory aforesaid and by other persons did solicit subscriptions for and sell said stock to the amount of seven hundred and fifty shares thereof and thereby did prevent this defendant from soliciting such subscriptions or selling such stock and by reason thereof, this defendant was prevented from earning and did lose the sum of Sixteen Dollars ($16.00) per share for said seven hundred and fifty shares of said stock and this defendant could have obtained said subscriptions and made said sales had he not been prevented by the acts of plaintiff and by reason thereof, defendant has sustained damages in the sum of Twelve thousand 00/100 Dollars ($12,000.00).''

The plaintiff answered the cross-complaint, specifically denying the averments thereof, and alleging, ''upon information and belief,'' that defendant never visited the city of Eureka in relation to the sale of the stock in any institution or financial corporation for or on behalf of plaintiff herein.

The court found that the allegations in plaintiff's first count or cause of action ''are, and each of them is, true,'' and that the allegations of the second cause of action set up in the complaint ''were not sustained by competent evidence or sufficient evidence, and they are, and each of them is, untrue.'' Those findings are followed by the following findings:

''The Court further finds that on or about the 20th day of August, 1923, defendant, C. G. Shuman, became indebted to plaintiff herein in the sum of Eleven Hundred Sixty-five ($1165) Dollars as and for payment of commission due plaintiff on two hundred thirty-three (233) shares of stock sold by said defendant under agreement with plaintiff wherein and whereby said defendant agreed to pay plaintiff

the sum of Five ($5.00) Dollars per share upon each and every share of stock sold by said defendant in The People's Finance & Thrift Co. of Napa, California.

"The Court further finds that all of the allegations and denials contained in defendant's Answer and Cross-complaint are, and each of them is untrue."

Judgment was accordingly entered for the plaintiff in the sum of $1,165, and the defendant appeals therefrom.

[1] The sole contention here of the defendant is that no evidence was offered or received "to overcome the evidence offered by appellant in support of the cross-complaint," and that, therefore, the finding "that all the allegations and denials in defendant's answer and cross-complaint are, and each of them is, untrue," is wholly devoid of evidentiary support. The contention is without substantial support.

It was not questioned at the trial, nor is it here, that, if the claim of damages as set up and demanded by the cross-complaint is unfounded, the defendant is indebted to the plaintiff in the sum for which it was awarded judgment. In other words, it is not disputed that defendant was indebted to the plaintiff in the sum of $1,165, and that the judgment should stand, if the former's alleged offset by way of damages is, as the court found, not sustained by the proofs. It will be necessary, however, to present the facts of the transaction out of which that indebtedness originated, inasmuch as they are directly connected with the defendant's claim of damages.

As the cross-complaint states, the plaintiff is a corporation and engaged in the business of buying and also in making loans on securities and, to extend the scope of the activities of said business, has established branches in a number of different communities in the state. These organizations were and are commonly called "industrial finance companies," and the defendant's principal business was in installing such organizations in the smaller cities and towns of the state of sufficient importance, industrially and otherwise, reasonably certain to assure success in the prosecution thereof. The defendant, as is alleged and admitted, was employed by the plaintiff as an organizer of these "industrial finance companies." Among the places

83 Cal. App.—32

in which he operated for the plaintiff in this line was the city of Napa. The terms of his employment for the organization and establishment of such finance company in said city were that he (defendant) was to negotiate for the subscription and sale of 750 shares of stock, at $1.25 per share, to be disposed of as follows: One hundred dollars to go into the treasury of the company on the par value of the stock thereof, $5 to be paid to the parent corporation (plaintiff), and $20 to be paid to the defendant as compensation for his services in organizing and installing the local company. Defendant, under this arrangement, started operations in the city of Napa, either in the month of March or April, 1923, and completed the sale of the 750 shares of stock and the organization and establishment of the company within a few months thereafter. The defendant thereupon forwarded a check to the plaintiff for the full amount of the commissions on 517 shares of the stock, and, in return, plaintiff paid to defendant, out of said amount, the sum of $20 for each share of the 517, retaining for itself the sum of $5 per share. Thus there were left, to be accounted for by defendant to plaintiff, the commissions on 233 shares of the 750 shares sold. In August, 1923, the defendant forwarded to plaintiff a check for $1,065, as the balance due the latter from the former for the amount unaccounted for by defendant to plaintiff (as above indicated), on the 233 shares. On said check the defendant indorsed a statement to the effect that said check was to operate as a receipt for the full settlement of the claims of plaintiff against defendant on account of the sale of the 750 shares of stock sold by defendant in the Napa City branch. This check was received for the plaintiff by its secretary-manager, Earl D. Pillsbury, at the city of Seattle, Washington, in the month of August, 1923. Perceiving that the check did not represent the full amount due plaintiff from defendant on the 233 shares of stock of the Napa company, to wit, the sum of $1,165, Pillsbury returned the check to defendant (then at Stockton), together with a letter, dated at Seattle, August 27, 1923, in which, among other things, it was stated: ''Am returning herewith your check for $1,065.00, with your endorsement on the back reading as follows: 'This check is settlement in full for all accts. of C. G. Shuman and settlement in full

for contract of organization of People's Finance & Thrift Co. of Napa, Calif.' Cannot accept this check with the indorsement as written for the reason it is *not* settlement · in full as written, not even covering the settlement on Napa alone, which should be for 233 shares at $5.00 per share, or $1,165.00. The settlement heretofore made on Napa was for 517 shares, leaving 233 shares to be settled. . . . Please send corrected check for Napa, mailing it to me at San Francisco, where I will be next Saturday. If you wish to put any endorsement on the back, make it read as complete settlement on Napa, and leave out the balance of the matters, which are not settled at all'' (referring to money claimed by Pillsbury to be due plaintiff for work at Oakland, and for bills for advertising in Stockton and Modesto, where companies had been formed).

The only question involved in this controversy is, as has been stated, whether the plaintiff violated its agreement with the defendant giving him, as he alleges in his cross-complaint, the exclusive right to establish a branch or local finance company for plaintiff in the city of Eureka. Defendant was subjected to an extended examination as a witness—first by plaintiff under section 2055 of the Code of Civil Procedure, and then as a witness for himself—and his testimony covered the entire period of time during which he was in the employment of plaintiff, commencing about September 1, 1922, and terminating with the organization and establishment by him of the Napa City branch of the latter. It will not be necessary, though, to enter upon a minute examination herein of the testimony. That the defendant and the plaintiff entered into a written contract on December, 1922, but dated January 1, 1923, whereby the former was granted by the latter the right or ''privilege,'' on certain specified terms and conditions, to organize and establish a local finance and securities company in the city of Eureka, said contract limiting the life thereof to the period of ninety days from its date, is not disputed. At some time, whether within the life of said contract or after the time during which it was by its terms to exist had expired does not clearly appear, the defendant, so he testified, visited Eureka and made a preliminary survey of the situation with reference to the contemplated organization of a finance company there, and

interviewed two bankers and secured their promise to co-operate with him after the organization of such company by acting as escrow agents, and also talked with and obtained the promise of certain automobile dealers in said city that they would hypothecate with or sell to the company, if organized and established in Eureka, their commercial paper. Whether said contract was in writing renewed or the time for its performance thus extended, the record does not show, but it does appear that he was given some further time after the termination of the period of time during which the written contract was of force and effect within which to organize and open for business a branch company for the plaintiff in Eureka; that, however, he proceeded no further in that direction than as above indicated. But it appears from his own testimony that, either in March or April, 1923 (defendant did not seem to be certain which of those two months), Shuman went to Napa City and proceeded to organize a company in that place, for himself and not for the plaintiff. Those two months, it will be noted, were comprehended within the period during which the life of the Eureka contract was to exist. At some time before the month of March or April, 1923, the plaintiff, so defendant testified, gave him the right or privilege of organizing and installing for it a branch company in the city of San Francisco. It appears that, just prior to the time at which defendant proceeded with and was engaged in organizing a company in Napa City, the plaintiff gave another party the privilege of organizing the San Francisco branch, without the consent of Shuman. Subsequently, E. D. Pillsbury, manager of plaintiff, had an interview or conversation with defendant relative to the work the latter was doing in Napa City. In that interview or conversation, defendant referred to the act of plaintiff in taking from him (defendant) the San Francisco territory to operate in, and declared in effect that the plaintiff had mistreated him in that particular matter; that for that reason he intended henceforth to operate for himself or some other company. Several other conversations were thereafter had between the parties relative to operations in Napa City, when, finally, so testified the defendant, it was agreed upon the part of Pillsbury that defendant should be granted and given the right to

open a branch company in the city of Eureka and, as a consideration therefor, the defendant would turn over to plaintiff the Napa City branch which he had organized for himself and not for plaintiff or as its agent. The defendant, as above explained, was to receive $20 per share, the plaintiff to receive $5 per share and the balance ($100) to be turned over to the treasury of the local company. A short time later, the formal work of organizing the branch in Napa took place, Pillsbury being present. At that time the defendant, so he testified, said to Pillsbury that he intended to go to Eureka within a few days and proceed with the organization of a company there. Pillsbury, testified defendant, said: "All right." About a week after that, so defendant said, he called Pillsbury on the phone from Napa, and stated to him that he (defendant) intended immediately going to Eureka to proceed with the organization in that city of a company, and that Pillsbury replied by saying that he had sent another party to organize a company there, and offered to give defendant the right to organize a company in Petaluma in place of Eureka, which proposition defendant testified that he refused. After some further talk on that occasion, in the course of which defendant charged Pillsbury with breaking his contract with him with respect to the Eureka transaction, defendant said to Pillsbury: "If you have gone into Eureka, naturally, I will withdraw out of there, but I am going to start a business for myself." Continuing, defendant stated that Pillsbury "still wanted me to operate in Santa Rosa for them, and *I refused to do it, and went ahead for myself.*" Defendant soon thereafter, and simultaneously with the operations prosecuted in Eureka by plaintiff's agent in the establishment of a company at that place, proceeded with and pressed the organization of a similar company in Santa Rosa, either for himself or a corporation in Spokane, Washington, carrying on business of the same character as that in which the plaintiff is engaged. Some time (the date is not given) after Pillsbury returned to defendant the check for $1,065, with a letter, stating that, because the check erroneously bore the indorsement that it represented payment in full of all demands held by plaintiff against defendant, the former could not and would not accept the

same, inasmuch as there was still a balance due plaintiff on the Napa transaction, the defendant addressed a letter to Pillsbury, evidently in response to the letter in which said check was returned as stated, in which, among other things, he said that "on my (defendant's) return from a trip east, I found your letter regarding check which I mailed you for settlement of Napa. I did make a mistake of $100, but, since you bring up the advertising accounts, I think it is best to arrange a meeting to settle all matters." The "advertising accounts," referred to in said letter, it is to be borne in mind, involved the expenses incurred in the different localities in which defendant organized companies for the plaintiff for advertising and publicity purposes; that a dispute arose between plaintiff and defendant as to the payment of those expenses—that is, whether defendant was to pay all such expenses, or only half thereof, or, in certain instances, whether he was obligated to pay any part thereof; that the said "advertising accounts" constituted the foundation for the second count or cause of action set up in plaintiff's complaint, in which it was alleged, in general language, that the plaintiff, having paid those accounts in full, was entitled to reimbursement from defendant for the proportion thereof that he was to bear.

While under examination by plaintiff under the provisions of section 2055 of the Code of Civil Procedure, the defendant, after stating that, upon completing the organization of the Napa company, he remitted to plaintiff by check the full amount received by him on 517 of the 750 shares of stock sold in said company, and that plaintiff, upon receipt of said check, returned to him $1,034, or $20 for each share of said stock, testified as follows: "Q. By counsel for plaintiff: That left a balance of 233 (of the 750) shares to be accounted for, didn't it, Mr. Shuman? A. There were 233 shares I made no statement on. Q. As a matter of fact, about August 20th, 1923, you did send them a check for $1,065, didn't you? A. Yes, sir. Q. How is it you sent them a check for $1,065 instead of $1,165, which would be $5 a share? A. *I fully intended to send them a check for the total amount, but through an error in computing the balance due them, which was unintentional, I sent them only $1,065,* . . . Q. And you intended to send them a

check for $1,165? A. I did. Q. And through a mistake of your own, you sent $100 short; that is correct, is it? A. Yes, sir.'' In the fall of 1923 and after the check above mentioned was returned by Pillsbury to the defendant, the two met at Santa Rosa, so testified the first named, in his deposition, which was received in evidence, and talked over their business affairs. In the course of this conversation Pillsbury, among other matters, introduced the subject of the balance due the plaintiff from defendant in the sum of $1,165 on the Napa transaction. The defendant in that conversation, Pillsbury deposed, did not make any reference to any counterclaim that he claimed to have against the plaintiff or which he intended setting off as against the indebtedness here sued for, but did say, in effect, that the plaintiff had agreed to pay one-half of the bills incurred in the organization of companies in Modesto and Sacramento. He further stated on that occasion, Pillsbury proceeded to say, that his attorney had objected to any action being taken by him without his (the attorney's) consent. Defendant thereupon made an appointment to meet Pillsbury "the following week," but failed to keep the appointment. Subsequently, however, Pillsbury met defendant in the law office of the latter's attorneys (Case & Forslund) in the city of Stockton, and there, in the presence of a Mr. Arbaugh, Mr. Forslund and plaintiff's attorney, held a conversation with him. In that conversation defendant admitted that he owed plaintiff $1,165 as a balance on the Napa transaction, but declared that he had a counterclaim against the plaintiff. Pillsbury, in his deposition, stated that defendant had never before made any claim against or demand, written or otherwise, for the payment of a claim upon plaintiff for or on account of the latter's alleged violation of any agreement between him and plaintiff relative to the organization of a company in the city of Eureka. The sole subject of controversy between defendant and plaintiff, Pillsbury deposed, related to differences between him and plaintiff in regard to the matter of the expenses incurred in the organization by defendant for plaintiff of companies in certain localities. Pillsbury testified: "Q. Do you know whether or not Mr. Shuman ever had a contract for the installation of a company at Eureka?

A. No written contract, to my knowledge. Q. Did you ever have any communication with Mr. Shuman in regard to the installation of a company at Eureka? A. Yes. Q. Where did that conversation take place? A. At the time the Santa Rosa conversation took place. Q. That was long after Eureka had been established by this company itself? A. Yes.''

On October 20, 1922, it appears from Pillsbury's deposition, one Wimsett, then president of plaintiff, wrote and sent to defendant a letter in which, among other things, the writer said: ''Pursuant to our telephone conversation, I will advise that I will hold the contracts on Santa Rosa and Eureka for a period of two weeks from today during which time you may take your choice as to which of those two points you care to enter after you have completed the work on the Oakland Bank. I wish, however, that you would make your choice as soon as you possibly can in order that I may give one of the places to some of the men who will be out of territory very shortly.'' This letter, having been sufficiently identified as Wimsett's letter, was admitted in evidence here, with Pillsbury's deposition.

Further examined by counsel for plaintiff, Pillsbury testified: ''Q. Did Mr. Shuman complete the installation of the Oakland institution? A. No. Q. Did Mr. Shuman ever notify you or the plaintiff here, in any way, to your knowledge, that he accepted the option given him for the installation of Eureka? A. No. Q. Did Mr. Shuman ever engage in the sale of stock in the city of Eureka for this company? A. No. Q. Did Mr. Shuman ever sell any stock for this company, or in any institution in Eureka? A. No. Q. Did this company, or its officers, or yourself, as far as you know, ever give Mr. Shuman any contract for the establishment of an institution in the city of Eureka? A. No.''

On October 26, 1923, Pillsbury addressed a letter to defendant, in which, among other things, he said: ''Have been expecting to hear from you ever since I received your telegram that you could not meet me in San Francisco at the time we had the appointment. I would have been glad to have met you and Mr. Case (the latter defendant's attorney) to have gone over these matters, but really do not see that

it is necessary to get together, *as there is no dispute as to the amount due.*" The letter proceeds to remind defendant of the meeting of himself and Pillsbury at Santa Rosa, at some time, not stated, at which meeting Pillsbury agreed that the plaintiff "would stand one-half of the bills due" for certain advertising for publicity purposes, provided defendant would pay the other half, and then continues: "As far as Napa is concerned, there is no question as to the amount due being $5 per share on 233 shares, or $1,165. I cannot for the life of me see why you should not send us this amount so that we can get these matters straightened out." The foregoing letter, so far as the record gives any information on the subject, was never answered by the defendant. It is well to note that the letter was dated, and presumably sent to and received by defendant, before the commencement of this action by plaintiff on the seventh day of December, 1923.

It would seem that no review, by way of analysis, of the foregoing statement of the evidence is necessary to show that the finding that the salient allegations of the cross-complaint are untrue is not justly subject to attack. The evidence relative to the Eureka proposition, aside from that afforded by the letter to defendant from Wimsett, and dated October 20, 1922, and the written agreement dated January 1, 1923, is very indefinite. As before suggested, it is not made to appear that, upon the expiration of the term specified in the agreement dated January 1, 1923, there was, either by writing or verbally, an extension or a renewal of said agreement, except in so far as such renewal may be inferred from defendant's testimony that, after he had completed the Napa organization, he said to Pillsbury that he purposed going to Eureka within a few days and proceed with the organization of the Eureka branch, and that, in reply, Pillsbury said, "All right." But it is clear from an examination of the testimony in its entirety that defendant not only permitted the contract dated January 1, 1923, to lapse without taking any substantial steps within the term prescribed thereby looking to the exercise of the privilege or option therein given him to install a company in Eureka, but expressly abandoned all intention of taking up and carrying out the organization of a company in said city. It will be noted that it was either in the month of

March or April, 1923, and within the period of time prescribed by the contract dated January 1, 1923, to which the life of his option as to Eureka was limited that he began preliminary operations for the establishment of the Napa company, and, so it is fairly and reasonably inferable from the testimony, that he devoted himself exclusively to that territory until the organization of the Napa company was completed; and then (accepting his own testimony) he declared it to be his intention not to go into Eureka and then proceeded, on his own account, or for a Spokane company, to organize the Santa Rosa institution. The testimony of Pillsbury supports this conclusion. He stated, as shown, that defendant never attempted to exercise his option to establish a company at Eureka; that he never solicited or attempted to solicit stock subscriptions in Eureka for a company in that city. The only differences existing between plaintiff and the defendant during the entire period of time from the date of the refusal by plaintiff to accept defendant's check for $1,065 as in full settlement of the Napa transaction to the later date on which, for the first time, defendant, in the city of Stockton, asserted a counterclaim to his $1,165 indebtedness to plaintiff for and on account of the Napa business, were relative to certain bills incurred for publicity purposes in the establishment of companies in certain places. And it may parenthetically be suggested that, as to those differences or the subject matter thereof, the court's decision in this case is adverse to plaintiff. (*Vide* findings on second count of plaintiff's complaint.) That defendant's claim of damages as to the Eureka matter was an afterthought and having for its basis the dispute upon the proposition whether defendant was to bear any of the expenses for publicity, etc., is clearly sustained by the consideration that, in the month of August, 1923, he sent his check for $1,065 to plaintiff as in settlement of the Napa transaction, and his admission in the trial of this case that his failure to make the check in the full amount due plaintiff on that account ($1,165) was owing entirely to an error of his own in computation; that his intention was to forward to the plaintiff the full amount due on the sale of the 750 shares of stock at $5 per share. It is entirely improbable that any business man of experience and intelligence would, as defendant did, forward to plaintiff a check for $1,065, only $100 less than the amount due,

in payment of the balance due it from him on the Napa transaction, if, at the time, he believed he had a just claim for damages against plaintiff far in excess of his entire indebtedness to plaintiff. This suggestion at least addressed itself to the question of the credibility of the defendant's testimony, and was sufficient to justify the trial court, to which the decision of the questions of fact was submitted, in rejecting the defendant's testimony, in so far as thereby he undertook to support the validity of his asserted claim for damages against the plaintiff for the reasons alleged in the cross-complaint and herein explained. And it is to be assumed from the decision that the trial court did reject it.

The plaintiff contends that the defendant could not, in any event, recover damages for a breach of the contract as to the Eureka transaction for the reason that the case here is one in which a reasonable estimate or appraisement of damages cannot be made or awarded. The cases of *Friedman* v. *McKay Leather Co.,* 175 Cal. 566, 569 [178 Pac. 139]; *Alderson* v. *Houston,* 154 Cal. 1 [96 Pac. 884], and *Parke* v. *Frank,* 75 Cal. 364 [17 Pac. 427], are cited in support of that proposition. But we do not deem it necessary to consider that proposition to determine whether the rule as stated in the cases named applies to the facts of the instant case. [2] After a painstaking examination of the record we are prepared, as must be manifest from what has been said before, to rest the decision here upon the proposition that this case, upon the evidence, is one for the trial court's decision—that is, for the decision of the question whether there was a breach of any contract between plaintiff and defendant as alleged in the cross-complaint. It was, as is well understood, for that court, as the trier of the facts, to resolve all conflicts, if any, arising in the evidence, and to determine the evidentiary value or probative force of the testimony of any witnesses testifying before it by tests which are obviously not available to a court of review. [3] The findings are conclusive upon this court upon the questions of fact.

The judgment is affirmed.

Plummer, J., and Finch, P. J., concurred.